**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jack MEKJIAN, Defendant-Appellant.**

**No. 73–3841.**

United States Court of Appeals, Fifth Circuit.

Jan. 6, 1975.

---

Theodore Klein, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Robert C. Byrne, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before BELL, SIMPSON and IN-GRAHAM, Circuit Judges.

SIMPSON, Circuit Judge:

After a jury trial, appellant, an osteopath practicing in Fort Lauderdale, Florida, was convicted upon sixteen counts of a sixty-count indictment for violations of Title 18, U.S.C., Sec. 1001.[1] Eighteen counts, Counts 1, 7, 14, 18, 21, 27, 34, 36, 37, 38, 39, 43, 48, 50, 52, 54, 56 and 60, were submitted to the jury, Mekjian being acquitted as to Counts 1 and 48. Each count involved the submission of false claims to Blue Shield as agent of the Social Security Administration under the Medicare program. He received concurrent sentences under the split sentence provisions of Title 18, U.S.C., Sec. 3651 to 18 months imprisonment, of which 15 days were to jail confinement with the remainder suspended under two years probation. A single $5,000 fine was also imposed. Dr. Mekjian asserts four errors in the trial court: (1) the failure of each count of the indictment to charge that the offense was done "willfully"; (2) the admission into evidence of history files of the Bureau of Health Insurance without proper authentication; (3) the admission into evidence of copies of patient records photocopied by a former employee without permission; and (4) the denial of a motion for a judgment of acquittal on counts as to which no live witness testimony was offered by the prosecution. We reverse for failure of the indictment to allege the essential element of "willfulness." We agree that the history files were improperly authenticated. The remaining two contentions we regard as insubstantial, but we discuss them for the benefit of court and counsel in the event of re-indictment and re-trial.

Medicare is a program administered by the Social Security Administration (SSA), an agency of the United States Department of Health, Education and Welfare (HEW). Title 42, U.S.C., Sec. 1395 et seq. (1970). Florida Blue Shield (BS), a private insurance carrier, was under contract with the SSA to process and pay Medicare claims. See Title 42, U.S.C., Sec. 1395u. A physician rendering services to Medicare patients may either bill the patient, who in turn submits a claim to BS, or, if an assignment is executed by the patient and physician, may bill BS directly. During the period covered by the indictment, appellant obtained the necessary assignments and submitted numerous "Requests for Medicare Payment" forms (SSA Form 1490), with representations therein that the indictment alleged were knowingly false. Specifically, he was charged with submitting bills for care never performed, with billing for Durabolin injections when in fact he had given B–12, and with submitting bills for laboratory work done in his office when in fact he had sent the work out to an independent laboratory. The significance of the latter two allegations was that re-imbursement was not permitted for a B–12 injection except in designated categories of cases, Medicare Part B,

---

1. Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. Title 18, U.S.C., Sec. 1001 (1970).

Intermediary Manual Sec. 6103.1, and (a change in) prescribed billing procedures required that work done by an independent laboratory be so indicated on the 1490's. Intermediary Manual, Sec. 6235.2.

Each count of the indictment contained similar wording except for differences in dates, patients' names, and in the underlying activities alleged. The statutory language "willfully" was not employed in any count.[2] Defense counsel moved prior to trial to dismiss the indictment for failure to allege the essential element of "willfulness". The trial court denied the motion at that time and again when it was renewed at the close of the evidence. The judge did, however, give instructions to the jury that proof of willfulness was required to sustain conviction.

A large part of the government's evidence was based upon copies of records made and given to the government by a nurse, Mrs. Jones, a former employee in the doctor's office. Disturbed by what she considered to be fraudulent conduct, she talked to a Mr. McDonnell, an employee of Florida Blue Shield and BS's manager of Medicare Part B for the State of Florida, over the telephone on October 21, 1971 and thereafter forwarded copies of records she had xeroxed with a cover note. On October 26, she sent a letter further substantiating her allegations. She was not in contact with either the government or BS from that time until late December, when she forwarded a copy of another patient chart to Blue Shield. On January 13, 1972, two FBI agents went to her home and told her not to copy any more patient charts. At that time, she turned over several more that she then had in her possession. In spite of the FBI's instructions she sent copies of more records in August 1972. The trial court, after a hearing, denied a motion to suppress, finding that no fourth amendment violation had occurred because the search and seizures were conducted solely by a private individual.

At trial, the government sought to prove that a change in coverage and billing procedures had taken place, that appellant was aware of such changes, and that he had altered his billing procedures accordingly. To this end, a letter sent out by BS to participating physicians notifying them of such changes was introduced into evidence. The government also sought to introduce a Medicare manual on coverage issued by the SSA to carriers, including BS. Because there was no testimony as to the currency of the manual at the time in issue, the document was ruled inadmissible. But the government was successful in introducing relevant portions of the manual contained in the history files of the Bureau of Health Insurance through the testimony of Mr. Harold Fishman, Chief of the Instructions Coordination Branch in the Bureau of Health Insurance of the SSA. The Instructions Coordination Branch does precisely what its name indicates; it coordinates and issues instructions of the Bureau of Health Insurance to carriers, including BS, who process claims. These instructions are sent out in the Medicare manual, noted above. In the event interim changes are made, intermediary letters are issued. Mr. Fishman testified that his office maintains history files on all revision transmittals issued (i. e. all changes in the manual), which are kept in the ordinary course of business and

2. A typical count of the indictment charged that appellant *knowingly did make and cause to be made a false, fictitious and fraudulent statement* and representation as to material facts in a matter within the jurisdiction of the Department of Health, Education and Welfare, Social Security Administration, an agency of the United States, in that in a document entitled "Request for Payment" (Form SSA–1490), submitted to Blue Shield of Florida, Inc., acting as agent for said Social Security Administration, Jack Mekjian stated and represented that he had performed certain medical services upon . . . [named individual], to wit: . . . [named services and date of services] whereas in truth and in fact *as he then knew he had not performed such services*, in violation of Title 18 United States Code, Sections 1001 and 2. (emphasis added)

under his care, custody and control. The standards contained in his files were admitted into evidence over appellant's objection.

█ Appellant asserts that the failure of the indictment to allege that the charged offense was committed "willfully" requires reversal of his conviction. We agree, and hold that "willfulness" is an essential element of a Sec. 1001 offense which must be alleged *in haec verba* or by words of similar import.

█ This court has recognized that an indictment must set forth all essential elements of an offense in order to apprise a defendant of the charge he must meet and to protect against double jeopardy. United States v. Fischetti, 5 Cir. 1971, 450 F.2d 34, 39, cert. denied, 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478. If this requirement were to be undermined, a defendant would have no assurance that a grand jury would have returned an indictment against him. United States v. Denmon, 8 Cir. 1973, 483 F.2d 1093, 1095.

The initial question for consideration, then, is whether "willfully" is an essential element of a Sec. 1001 offense. We answer this question in the affirmative. The statute uses both "willfully" and "knowingly" in defining the offense. Each encompasses a different element of the requisite *mens rea*, requiring differing proof. "Knowingly" under Sec. 1001 requires proof that a defendant acted "with knowledge." See McBride v. United States, 5 Cir. 1955, 225 F.2d 249. "Willfully" under Sec. 1001 requires proof that a defendant acted "deliberately," or "deliberately and with knowledge." Id. at 253–255; see United States v. Parten, 5 Cir. 1972, 462 F.2d 430, 432–433. Each must be proved beyond a reasonable doubt, as the district court recognized by so instructing the jury. See 225 F.2d at 253; Walker v. United States, 10 Cir. 1951, 192 F.2d 47, 49. It follows that, if a defendant is to be assured that he is being called to answer only to a grand jury indictment, is

to be protected against double jeopardy, and is to be apprised of the charge he must meet in order to challenge effectively the government's proof, an allegation that the act alleged was done willfully must appear in the indictment.

█ "Willfulness" not being specifically alleged, the next question is whether the counts submitted to the jury contained words of similar import. We determine that they did not.

The government contends that from the allegations of "fraudulent statement," "as he then knew he had not performed such services," "knowingly," and the facts as set forth in the several counts, a charge that the acts were done "willfully" may be implied. We reject this contention because, as noted above, to act "willfully" means to act "deliberately." None of the allegations relied upon by the government import more than that the defendant acted "with knowledge," a separate and distinct element of a Sec. 1001 offense.

█ The similar import doctrine advances the policy, reflected in F.R.Cr.P. 7(c), against fine-combing indictments for technical errors. But the words of similar import must be clear enough to insure that the indictment meets the purposes it is intended to serve. Such assurance is not present here.

Our decision in United States v. Fischetti, 5 Cir. 1971, 450 F.2d 34, cert. denied, 405 U.S. 1016, 92 S.Ct. 1290, 31 L. Ed.2d 478 controls this question. The indictment in that case charged the defendant with demanding, requesting and agreeing to receive and accept money from an employer engaged in an industry affecting interstate commerce in respect to his actions as an officer of a labor organization, in violation of Title 29, U.S.C., Sec. 186(b)(1). The statutory requirement that this be done "willfully" was omitted from the indictment. Although the issue before the court was whether an amendment to the indictment by the trial court was permissible, this court found the change to be a sub-

stantial one in the nature of the offense charged. Judge Dyer stated:

> When the original indictment was returned in this case, the substantive counts did not allege that the appellants had "willfully" violated the statute. Willfulness is specifically set out in the statute *sub judice*. It is thus an essential element of the offense and such statutory requirement cannot be ignored. (Citations omitted) It must be alleged and proved in order to obtain a conviction. Id. at 39.

In an indictment comparable to the present one, this court found that "[t]his essential element cannot be implied from a reasonable reading of the language of the indictment." [3] Id. Where an essential element is omitted, a trial court's instructions to the jury on the necessity of finding the missing element will not cure the error. See *Denmon,* supra 483 F.2d at 1097.

Inasmuch as the government may later try the appellant upon a new indictment, we address the remaining grounds of claimed error.

■ Appellant argues that the government failed to authenticate properly the history files admitted into evidence on the basis of Mr. Fishman's testimony as government composite exhibit 17. He urges that copies of official records of the Bureau of Health Insurance can be admitted into evidence only if their authenticity is certified by the Secretary of HEW or those to whom he has delegated this authority by virtue of Title 42, U.S.C., Sec. 3505.[4] Relevant delegations and redelegations have been made only to the Assistant Secretary for Administration and the Director and Deputy ·Director of the Bureau of Health Insurance. 32 Fed.Reg. 17550 (1967); 32 Fed.Reg. 17866 (1967); 33 Fed.Reg. 2613 (1968); 34 Fed.Reg. 13046 as amended by 37 Fed.Reg. 10602 (1972). Therefore, he continues, the government must offer properly certified copies of the rules then in effect or those individuals authorized to certify authenticity must appear in court to lay the predicate for the admission of the history files. We agree.

■ The government contended in the court below and urges on appeal that the history files were properly received in evidence under the business records statute, Title 28, U.S.C., Sec. 1732. The government misconceives the scope and purpose of this statute. Sec. 1732 is a codification of the shop book rule.[5] It

---

3. Although we note that *Fischetti* did not involve a Sec. 1001 offense, the principle of that case nevertheless controls. The only Sec. 1001 case we have found where "willfully" was omitted failed to indicate what allegations of fact the court found sufficient to save the indictment. United States v. Okin, D.C.N.J.1955, 154 F.Supp. 553. It therefore, can offer little comfort to the government.

4. The Administrator of the Federal Security Agency [Secretary of Health, Education, and Welfare] is authorized to adopt an official seal to be used as directed by the said Administrator [Secretary of Health, Education, and Welfare] on appropriate occasions in connection with the functions of such Agency [Department of Health, Education, and Welfare] or of any office, bureau, board, or establishment which is or shall hereafter become a part of such Agency [Department of Health, Education, and Welfare], and such seal shall be judicially noticed. Copies of any books, records, papers, or other docu-

ments in the Federal Security Agency [Department of Health, Education, and Welfare] shall be admitted into evidence equally with the originals thereof when authenticated under such seal. Title 42, U.S.C., Sec. 3505.

5. For the kind of record coming within this exception, see Hanley v. United States, 5 Cir. 1969, 416 F.2d 1160, cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91, and cases cited therein. The records were "created in the ordinary course of business affairs, as routine recurring entries to identify routine transactions," attesting to their trustworthiness. Id. at 1167. Further,

> The purpose of this law was to render unnecessary the strict requirements of the common law for producing as witnesses every person who had anything to do with the record in order to prove its authenticity. Stegemann v. Miami Beach Boat Slips, 5 Cir. 1954, 213 F.2d 561, 563.

In La Porte v. United States, 9 Cir. 1962, 300 F.2d 878 a document was accurately de-

is not, and was not intended to provide, a catchall which will allow the government the benefit of introducing any documents it wishes in order to avoid the authenticating procedures directed by other statutes when Sec. 1732 is inapplicable. One could as logically qualify a copy of an Act of Congress kept in a congressman's file as a business record within the meaning of Sec. 1732 as the document in issue here.

The district court allowed the files into evidence, apparently impressed by the fact that these documents appear to carry indicia of their reliability on their face and evidently reassured that Mr. Fishman's testimony settled earlier confusion as to effective dates of coverage.

While acknowledging that "[t]he trial court has a broad zone of discretion in determining the admissibility of documents," United States v. Miller, 5 Cir. 1974, 500 F.2d 751 (1974), we opine that these files were improperly received as evidence of authorized standards. Despite the documents' appearance of reliability statutory requirements were not here complied with, and the documents in the form proffered should have been excluded.[6]

■ Appellant's third contention is that his fourth amendment rights have been violated by allowing into evidence copies of records made by a nurse while in his employ. A delineation of the time sequence involved and the evidence adduced is necessary in order to understand the objections raised. In October,

1971, Dr. Mekjian's office nurse, Mrs. Jones, began making photocopies of the records. On October 21, she contacted Mr. McDonnell, an employee of BS, to ask where she could forward information she had obtained on Medicare fraud. In the phone call she stated that she has some of the patient charts and records and that false claims had been submitted. At that time she refused to reveal her identity. Mr. McDonnell notified his supervisor of the call, indicating that a woman had "agreed" to supply him with some patient records. On October 27 Mr. McDonnell received the first batch of records, mailed a few days earlier. Mrs. Jones included a note which contained the statement, "Here is some material I promised you", and indicated that more material would follow. She testified she wrote another letter on October 26. This letter was received October 28. It stated that she had been planning to leave but "decided to stay until I could find some way to try to right this terrible wrong that was taking place." In late December, she forwarded copies of another record. On January 13, 1972, FBI agents contacted her for the first time and told her not to copy any more records. They did, however, accept from her records which she had copied between October and January. She disregarded their directive and copied another record in August 1972, the Norman Drug records. At no time until the January 13 visit by the FBI did the government tell Mrs. Jones not to send information or not to copy

---

scribed as falling within the purpose and scope of Sec. 1732 because it was a

"contemporaneous record of events, systematically prepared by an agency for its own use and relied upon by it in the performance of its functions, which experience has shown to be trustworthy . . ." Id. at 880.

6. In the trial court and on brief the United States has contended as noted in the text, that these documents should have been received under Title 28, U.S.C. Sec. 1732, the business records statute. No mention is made of the following section, Sec. 1733(a) of Title 28, which deals with admission of books or records of account or minutes of

proceedings of any department or agency of the United States, "to prove the act, transaction or occurrence as a memorandum of which the same were made or kept".

Our view would remain the same if the documents had been offered as qualified under Sec. 1733(a). These history files of the Bureau of Health Insurance were clearly not "books or records of account or minutes of proceedings" of a department or agency of the United States.

Sec. 1733(b) provides for admission of properly authenticated copies or transcripts of books, records, papers or documents of any department or agency of the United States.

any more records. According to her testimony, the government did not know she was copying records until her initial contact with Mr. McDonnell, nor did it know she would continue to do so.

Appellant argues that any records copied after the initial contact with the government's agent, BS, are inadmissible. When the government then becomes aware that an illicit search is being conducted by a private person, it is under an affirmative duty to direct that such activity cease and may not take use of the fruits of any continued search. For at that point, appellant contends, there is government participation and knowledge which subjects the later searches to the full panoply of fourth amendment protections.[7] The government, in response, contends that the search was conducted entirely and solely by a private individual, and as such is not subject to the fourth amendment. After a full hearing on a motion to suppress, the district court rejected appellant's contentions. The ruling of the district court was not clearly erroneous. The evidence was properly allowed before the jury for consideration in the circumstances presented here.

■■■ Burdeau v. McDowell, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 has made it clear that the fourth amendment was intended as a restraint on the activities of the government and its agents and is not addressed to actions, legal or illegal, of private parties. Where no official of the federal government has any connection with a wrongful seizure, or any knowledge of it until after the fact, the evidence is admissible. See United States v. Harper, 7 Cir. 1971, 458 F.2d 891, cert. denied, 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132; United States v. McGuire, 2 Cir. 1967, 381 F.2d 306, cert. denied, 389 U.S. 1053, 88 S.Ct. 801, 19 L.Ed.2d 848; Barnes v. United States, 5 Cir. 1967, 373 F.2d 517. No objection, therefore, has been raised or could be raised as to the admissibility of any records copied before the initial contact of Mrs. Jones with BS.

■■■■ A much more difficult issue arises once the government is contacted. The fourth amendment is given a generous interpretation in order to insure that its safeguards are not evaded by circuities. Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. Fourth amendment protections can be effectively undercut by the intervening agency of non-governmental individuals. Accordingly, where federal officials actively participate in a search being conducted by private parties or else stand by watching with approval as the search continues, federal authorities are clearly implicated in the search and it must comport with fourth amendment requirements.

The leading case in this area is Lustig v. United States, 1949, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819. There a federal agent joined an illegal search while it was in progress, picking and choosing objects which could aid in a federal prosecution. The Court pointed out that a search is a functional, not merely a physical process. It is not completed until effective appropriation, as part of an uninterrupted transaction, is made. Because the federal agent joined the search before it was completed, the evidence was excluded. The Court went on to state that a search is a federal search if the federal agent has a hand in it. It is not if the evidence obtained by state authorities is turned over on a silver platter. · Although the "silver platter" doctrine allowing fruits of illegal state searches to be freely received in the federal courts has now been abrogated, Elk-

7. From the records, briefs, and oral argument, it is unclear whether the records Mr. McDonnell received on October 27 had been made before the initial phone call on October 21 or had been made after that phone call. It is also unclear exactly what records are being objected to. At oral argument, appellant's counsel stated that the first batch was not being objected to. If some of those records were copied after the first phone call with Mr. McDonnell, however, they are subject to the same objection as is raised to copies made later.

ins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, that former rule has its analogue in the law governing searches conducted by private individuals. Cases holding that fourth amendment rights have been violated by the intervening agency of non-governmental individuals have usually involved searches conducted by private persons under the active supervision of state or federal authorities,[8] but it is equally clear that such protections may be as effectively undercut by private individuals conducting a search with government knowledge and consent, tacit or explicit, even though the government authorities have removed themselves from the immediate physical scene. See Knoll Associates, Inc. v. FTC, 7 Cir. 1968, 397 F.2d 530.

In any search conducted by a private individual in which the evidence is later turned over to federal authorities, and especially where as here the evidence is turned over in several stages, the question arises whether or not there was such participation by the federal authorities as to require a holding that they had a hand in it. "The decisive factor in determining the applicability of the *Byars* case,"[9] making a search a federal one, "is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means."[10] *Lustig,* 338 U.S. at 79, 69 S.Ct. at 1374, 93 L.Ed. at 1823. It must be remembered nevertheless that the fourteenth amendment is aimed at governmental action. Action clearly private is outside its scope.

The decision here, then, finally revolves around the factual situation with regard to government participation and government knowledge that an illegal search was being conducted and that the government would be the beneficiary of such misconduct. If government officials were aware, or should have been aware, that Mrs. Jones was removing and copying records for their use, they will not be permitted to stand by or blink their eyes and accept the benefit of her activities. On the other hand, absent governmental knowledge, actual or implicit, that she would continue to copy records after her phone call with Mr. McDonnell and absent encouragement or cooperation, the evidence was admissible. The meaning of the statements made with regard to promises to send information depend upon the context in which they were made and the credibility of witnesses. This appraisal was a role most appropriate for the trial judge. We cannot say that his finding of non-governmental involvement on this record was clearly erroneous.

■ Appellant's final contention is that a judgment of acquittal should have been granted on 13 counts involving no live-witness testimony by appellant's patients. These thirteen counts were proved by the absence of supportive entries in the patient records. Appellant's wife would work on the charts at home when sending out bills. If a patient was treated while Mrs. Mekjian had the charts, treatment would be noted on a separate piece of paper. Mrs. Jones characterized the patient charts as "loose". In addition, Mrs. Jones only removed a portion of the patient file. Appellant urges that this evidence lacks sufficient earmarks of trustworthiness to carry the issue to the jury. We are not persuaded by this contention.

8. See e. g., United States v. Payne, 9 Cir. 1970, 429 F.2d 169; Moody v. United States, Mun.App.D.C.1960, 163 A.2d 337.

9. Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520.

10. Thus, government action was present in the taking in Knoll Associates, Inc. v. FTC, 7 Cir. 1968, 397 F.2d 530, where federal authorities were not physically present. An employee of defendant's agent stole a document for the purpose of assisting the FTC counsel in the prosecution of a pending proceeding. The court ordered the material suppressed on the basis that the FTC, by its use, knowingly gave its approval to the unlawful act.

The test to be applied upon review of a denial of a motion for a judgment of acquittal has been stated as follows:

"[o]n a motion for judgment of acquittal, the [appellate] test is whether, taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. . . . [I]n criminal cases based on circumstantial evidence our task is to determine whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence." (Citations omitted). Weighing the sufficiency of the evidence in such a case does not depend upon whether "in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis, but that of guilt, but rather whether the jury might reasonably so conclude." (Citations omitted).

United States v. Edwards, 5 Cir. 1974, 488 F.2d 1154.

See also Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L. Ed. 680, 704.

The government's evidence in support of these thirteen "no live witness" counts consisted in the main of the absence of supportive entries on patient charts for which bills were submitted. The chart entries primarily reflected different treatment from that billed. Outside laboratory and hospital records were introduced in support of the government's case. In addition to the testimony of Mrs. Jones, there was testimony by a physician, Dr. Tucker, who covered for Dr. Mekjian while the latter was hospitalized, as to services rendered which contradicted statements in the Form 1490's submitted by appellant.[11] We find the patient charts and support-

ive evidence sufficient to withstand a motion for judgment of acquittal. The trial court's denial of such a motion was proper.

Reversed.

---

11. Dr. Tucker did not bill Medicare directly for services he rendered in appellant's office. Dr. Mekjian, rather, billed Medicare for these services.