**UNITED STATES of America**

v.

**Alfred B. DIGGS.**

**Crim. No. 75-56.**

United States District Court,
M. D. Pennsylvania.

April 24, 1975.

Sal Cognetti, Jr., Asst. U. S. Atty., Scranton, Pa., for plaintiff.

Nathan H. Waters, Jr., Wallace B. Eldridge, III, Harrisburg, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, District Judge.

Defendant has filed a motion to suppress the Government's search and seizure, without a warrant, of a metal box containing currency allegedly taken in a bank robbery in Harrisburg on January 14, 1975. A hearing on the motion was held April 23, 1975, and evidence received from which the following findings are made.

On Thursday night, January 23, 1975, at approximately 11:30 P.M., Robert M. Fanning, a Special Agent for the FBI stationed at New Bern, North Carolina, received a telephone call from B. H. Baxter, Esq., an attorney in New Bern, who advised Fanning that he had been consulted by Rev. Andrew T. Bradley who had expressed great upset concerning a metal box which had been placed in his custody the prior weekend by his niece and her boyfriend and which might be connected with a recent bank robbery in Harrisburg, Pennsylvania. Baxter related that Bradley had called relatives in Harrisburg after his visitors had left and was told that defendant had been arrested for bank robbery. Mr. Baxter asked the Agent if he would call Rev. Bradley immediately because he was excited and concerned about the box. Agent Fanning placed a call to Rev. Bradley who told him that he and his wife were originally from Harrisburg; that many members of their families still lived there; that his niece and defendant visited them on Saturday, January 18, 1975, and had remained until Monday, January 20th; that they had given him a metal box for safekeeping "so they wouldn't be tempted to spend it" and represented that it contained silver notes and bonds for their children;[1] that he called his sister in Harrisburg to inquire about his niece's safe return and learned that defendant had been arrested in connection with a bank robbery in Harrisburg; that he had not looked in the box but was concerned that the contents may be related to the bank robbery, and that he wanted someone from the FBI to be there when he opened the box. When Agent Fanning suggested that he wait until the following morning because it wasn't "a pressing matter", Rev. Bradley insisted that the Agent come to his home that night and Fanning agreed.

In approximately one hour, Agent Fanning and Special Agent Robert S. Shields arrived at the Bradley home and were seated in the living room with Rev. and Mrs. Bradley. Once again Rev. Bradley related the background information and, in addition, mentioned that he had called his niece after learning of defendant's arrest and found her to be evasive inasmuch as she didn't disclose the fact that defendant had been arrested until specifically asked and then described it as "some silly mess". Moreover, she told Rev. Bradley that she had been interrogated by the FBI in Harrisburg and told them of her visit to North Carolina and, in response to a specific question, denied that she left anything at the Bradleys'

---

1. Rev. Bradley's niece, Christine Mahone, and defendant lived in a common-law relationship and had two children.

home. She stated further that the FBI would probably come to question him and that he should deny that they left anything with the Bradleys. Rev. Bradley told the Agents that he remembered after the phone conversation that the metal box had been left with them and realized that his niece had lied to the authorities. He said he felt from her conversation that "something was very much wrong" and that he was "pretty well convinced that Bennie (defendant) and Chrissie knew something or were involved in the bank robbery." To verify the bank robbery, Agent Fanning placed a call from the Bradley home and talked to Special Agent James Stewart in Harrisburg. Agent Stewart advised Fanning that the National Central Bank in Harrisburg had been robbed on January 14, 1975, by three armed black males;[2] that $75,000 had been taken including bait money in denominations of $20; that defendant had been arrested as a result of eyewitness identification and charged with the robbery; that a pistol used in the robbery had not been recovered; and that Christine Mahone had told him that she and the defendant just returned from a trip to North Carolina to visit the Bradleys, although she didn't disclose that a metal box had been left in their custody.

After receiving this information, Agent Shields asked Rev. Bradley, "Would you get the box for us?" Rev. Bradley retrieved the box from his closet and placed it on a coffee table. Shields attempted to lift the lid and, after shaking the box, determined that it was locked. Rev. Bradley informed the Agents that no key had been left with them. Rev. Bradley stated that he wanted the box opened and if the contents were "innocent", he would call his niece and apologize. A discussion ensued about the availability of a locksmith[3] and while Agent Fanning was on

the telephone attempting to reach a locksmith in New Bern, Agent Shields tried to unlock the box with several keys from his key ring and discovered that his desk key unlocked the box. He informed Fanning of this, unlocked the box, removed the key and said to Rev. Bradley, "I'll give you the pleasure of opening up the box". Rev. Bradley lifted the lid on the box, revealing the presence of a large amount of money in various denominations. The Agents removed the money, counted it, separated it according to denominations, and wrapped it into smaller bundles. The total amount was $17,080.00.

Rounding out the picture, it should be noted that Rev. Bradley was very insistent that the box be opened while the Agents were present; that the Agents felt that Rev. Bradley was honest, truthful, trying to do the right thing, and genuinely concerned about the box, its contents, and his niece's possible involvement; that the Agents suspected that the box contained bank money or guns; that the Bradleys did not give the Agents the impression that they had authority to open the box; that the Agents did not believe that Rev. Bradley would open the box, conceal it, or otherwise interfere if they decided to leave his home and obtain a search warrant; that there was a United States Magistrate domiciled in New Bern and that it would take approximately two hours to obtain a search warrant and return to the Bradley home; and that Rev. Bradley, despite his distress, would have been satisfied if the Agents left for two hours to procure a search warrant.

Our analysis of this case starts with Coolidge v. New Hampshire, 403 U.S. 443, 454, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) wherein the Supreme Court reiterated that

" . . . the most basic constitutional rule in this area is that 'searches conducted outside the judicial proc-

---

2. Defendant is black.

3. Rev. Bradley testified that the Agents also talked about getting a warrant but appeared indecisive about it.

ess, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'

'[T]he burden is on those seeking the exemption to show the need for it.' "

In the instant case, Agent Fanning received sufficient information in his phone conversation with Rev. Bradley to allow him to seek to procure a search warrant based on probable cause before proceeding to the Bradley home. He knew, also, that Rev. Bradley wanted him immediately for the purpose of determining the contents of a metal box left in his company by one who had been arrested for bank robbery. It was not a routine investigative visit as existed in Coolidge v. New Hampshire, *supra*. Assuming arguendo that probable cause did not exist at that time, it most certainly did after his arrival when Rev. Bradley related the evasions and untruths of Christine Mahone, and Agent Stewart, by telephone, confirmed defendant's arrest based upon eyewitness identification, the details of the crime, the large amount of money involved, the bait bills in $20 denominations, the missing pistol, and the visit of defendant to the Bradleys after the robbery. All of this occurred before the Agents even saw the metal box. Moreover, there was no reason to believe, and the Agents did not believe, that Rev. Bradley would open, secrete, or otherwise interfere with the box if the Agents decided to obtain a search warrant, a matter that would involve only two hours. Rev. Bradley impressed the Agents, as he did the Court, as an honest, law-abiding citizen who was anxious to cooperate in the investigation. While he may have been extremely anxious to open the box, this did not relieve the officers of their obligation to adopt constitutional means. They knew that the box was not his and, by their own admissions, he had not indicated to them that he had the owners' permission to open the box. As a matter of fact, he promised that he would call and apologize if the contents were non-incriminating. However, the Agents testified that they strongly suspected that the box contained money or material related to the bank robbery. Under the circumstances, unless the warrant requirement of the Fourth Amendment is to be reduced to a nullity, the Agents should have presented this matter to a magistrate. The inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate are never very convincing reasons to bypass the Constitutional requirement. Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

The Government attempts to remove this case from the strictures of the Fourth Amendment by arguing that (a) this was a private search and seizure without governmental participation and (b) Rev. Bradley was authorized to give consent to the search and seizure.

## PRIVATE SEARCH

"(A) search is a search by a federal official if he had a hand in it . . . The decisive factor . . . is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. *So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it.*" (emphasis supplied) Lustig v. United States, 338 U.S. 74, 78, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949).

The evidence before us reveals that Agent Shields requested Rev. Bradley to get the box and, upon receiving it, shook it and attempted to open it before determining that it was locked. Inci-

dentally, this was the first notice to any of the participants that the box was locked. The Agents then commenced efforts to obtain a locksmith presumably to force open the box. In the meantime, Agent Shields, using one of his keys, actually unlocked the box and then turned it over to Rev. Bradley for the purpose of raising the lid. After the contents were revealed, the Agents removed, counted, separated, and wrapped the money. The money was then replaced in the box and the Agents took complete custody of it. The Agents not only had a hand in opening the box and removing its contents, they practically monopolized the effort. Rev. Bradley's only participation was to respond to the Agent's request to procure the box and to perform the ceremonious act of lifting the lid. The unlocking of the box by the Agent was the sine qua non of the search and seizure. On top of that, the Agents removed the money and inventoried it. The Governmental participation here was substantial and predominant. Indeed, it has recently been stated that " . . . where federal officials actively participate in a search being conducted by private parties or else stand by watching with approval as the search continues, federal authorities are clearly implicated in the search and it must comport with fourth amendment requirements." United States v. Mekjian, 505 F.2d 1320, 1327 (5th Cir. 1975). It is obvious that there was much greater Governmental involvement here and, at the very least, would be a joint undertaking with Rev. Bradley. Nevertheless, even where there is a joint effort " . . . the effect is the same as though [the federal agent] had engaged in the undertaking as one exclusively his own." Byars v. United States, 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927). Consequently, there was sufficient Governmental implication to require compliance with the Fourth Amendment.

## CONSENT

■ "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed. 797 (1968). Consent to a search is not to be lightly inferred, but should be shown by clear and convincing evidence. Phelper v. Decker, 401 F.2d 232, 236 (5th Cir. 1968). There is no evidence whatsoever that either Christine Mahone or the defendant, in fact, freely and voluntarily gave consent to the opening of their metal box. Indeed, the turning over of a locked metal box without the key for the purpose of safekeeping strongly negates any intent to waive the right of privacy or to consent to opening and searching the box. See Clarke v. Neil, 427 F.2d 1322, 1325 (6th Cir. 1970); Corngold v. United States, 367 F.2d 1, 7 (5th Cir. 1966). The Bradleys were neither owners nor users of the metal box and could not consent to a search of it. See Government of Virgin Islands v. Gereau, 502 F.2d 914, 926 (3d Cir. 1974). Nor is there any evidence that the Bradleys were given such unrestricted freedom over the box and its contents that the owners can be held to have accepted the risk that the Bradleys would consent to a search, in other words, impliedly authorize them to consent to an invasion of their right of privacy. Corngold v. United States, supra, 367 F.2d at p. 7. The comment in Wright, Federal Practice and Procedure: Criminal § 669, at p. 88, is helpful here:

"Since the [Supreme Court] in other contexts has now come to recognize that the Fourth Amendment is not concerned with property rights but rather with a right to privacy, possessions and control of property seem irrelevant to a power to consent to search."

The Government's reliance on United States v. Matlock, 415 U.S. 164, 94 S.Ct.

988, 39 L.Ed.2d 242 (1974) is misplaced. In Matlock the defendant jointly occupied a bedroom with one Mrs. Graff who consented to a search of the bedroom and closet. The Court held that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom the authority is shared. However, the opinion specifically pointed out that "(t)he authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any one of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id., at 171, n. 7, 94 S.Ct. at 993. There was no mutual use or joint access or control of the metal box that would justify a conclusion that defendant or Christine Mahone assumed the risk that the Bradleys might permit the box to be unlocked, opened and searched. See Commonwealth v. Storck, 442 Pa. 197, 275 A.2d 362 (1971).

The factual background of United States v. Brown, 300 F.Supp. 1285 (D. C.N.H.1969) is similar to the case at bar. There the personal effects of the defendant in the form of two suitcases and an attache case were searched and seized without a search warrant in the apartment of a friend where they had been left with permission. Although the friend may have granted permission to FBI agents to search the apartment, the Court held that such consent could not be extended to the opening of another person's locked attache case. As here, the Court noted that a search warrant should have been obtained because there was no risk that the defendant would flee or that the seizure was necessary to forestall an attack on the agents or that the evidence would have been destroyed. The reasoning in favor of granting the motion to suppress in that case applies with equal force here.

Therefore, after carefully considering the evidence and the arguments of counsel, the motion to suppress is granted.