UNITED STATES of America

v.

**Alfred B. DIGGS.**

**Crim. No. 75–56.**

United States District Court,
M. D. Pennsylvania.

Jan. 26, 1977.

.S. John Cottone, U. S. Atty., Scranton, Pa., for plaintiff.

Wallace B. Eldridge, III, Pottsville, Pa., Nathan Waters, Jr., Harrisburg, Pa., for defendant.

MEMORANDUM

NEALON, Chief Judge.

In this matter, this Court granted a defense motion to suppress certain evidence

and, on appeal, the Third Circuit Court of Appeals remanded for further findings in light of *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and "any further additional findings which it may deem relevant to a just determination in the light of the opinions filed in the case."[1] *United States v. Diggs,* 544 F.2d 116, 123 (3d Cir. 1976). An evidentiary hearing was held October 22, 1976, and a transcript subsequently prepared. Pursuant to a briefing schedule, defendant's brief and requests for findings of fact were filed November 18, 1976, and the Government's brief was filed December 22, 1976. On January 10, 1977, defense counsel advised the Court that they did not intend to file a reply brief. The factual background, except as hereinafter amplified, is set out fully in *United States v. Diggs,* 544 F.2d 116 (3d Cir. 1976) and *United States v. Diggs,* 396 F.Supp. 610 (M.D.Pa.1975), and need not be repeated here.

Addressing first the questions raised by Judge Gibbons, it is apparent that a majority of the Court concluded that Reverend Bradley had the authority, as gratuitous bailee, to surrender the possession of the locked box, which he suspected contained contraband, to the agents of the F.B.I. Judge Gibbons, nevertheless, distinguished the property and privacy interests protected by the Fourth Amendment and concluded that Reverend Bradley's possessory interest over the exterior of the locked box did not authorize him to surrender defendant's expectation of privacy with respect to the contents of the box and consent to a search. Since the bailee did not have authority to consent to a search, Judge Gibbons reasoned, the authority of the agents to conduct a search must be examined. Such authority he believed might be found in the exception of an inventory search which is allowed in cases where the police are in lawful possession of a vehicle or box provided ". . . not only that an inventory search could properly have been made, but

also that the search in question was conducted for inventory purposes." 544 F.2d at 125–126. Referring to *South Dakota v. Opperman, supra,* Judge Gibbons emphasized that "the inventory search exception applies only where the court finds that an inventory search, not an investigatory search, was in fact intended . . . ." *Id.* at 127. In furtherance of this, Judge Gibbons believed the trial court should make findings with respect to the agents' purpose in searching the inside of the box, *e. g.,* were they acting pursuant to standard F.B.I. procedures designed to safeguard the property coming into their possession as well as to protect the Bureau from any claims arising out of this caretaking function?

First, as to the agents' purpose in searching the box, from an evaluation of the testimony of the agents, and the inferences that I believed should logically be drawn therefrom, I make the following findings of fact:

(1) When the agents proceeded to the Bradley house during the early morning hours of January 24, 1975, they were participating in a federal investigation of a bank robbery to determine whether a metal box in Reverend Bradley's possession had anything to do with the bank robbery. (N.T. 95, 96, 105, 119)

(2) The agents did not suspect that Rev. Bradley had been involved in a criminal offense. (N.T. 87, 89)

(3) In responding to Rev. Bradley's urgent call to come to his home for the purpose of opening the metal box, the agents did not believe they were engaged in a search that required the obtaining of a search warrant. (N.T. 88, 89)

(4) If the agents believed a search warrant was necessary, either one of them or all of them, including Rev. Bradley, would have proceeded to a Magistrate either with or without the box as the agents did not believe that the box would

---

1. Judge Maris filed an opinion joined by Judges Aldisert, Weis and Rosenn. Judge Adams filed a concurring opinion. Judge Gibbons also filed a concurring opinion but requested a remand for further findings in light of *South Dakota v. Opperman, supra.* Judge Van Dusen, joined by Chief Judge Seitz, Judges Hunter and Garth, dissented.

have been tampered with in their absence. (N.T. 40, 50, 73, 74, 90, 91, 94, 95)

(5) Prior to unlocking the box and turning it over to Rev. Bradley to lift the lid, Agent Shields[2] shook it and heard no metallic sound, thereby concluding that it did not contain a handgun or silver coins but may have contained currency. (N.T. 114, 115, 120)

(6) Agent Shields testified, and I so find, that the purpose in searching the box was to see if there was anything in it connected with the bank robbery and not to prepare an inventory because there may have been non-bank-related items which he would not inventory because he would not take possession of them. (N.T. 121, 122)

(7) There are no standard F.B.I. procedures designed either to safeguard property coming into an agent's possession or to protect the Bureau from any claim arising out of any caretaking functions. (N.T. 103, 104, 112, 116)

(8) The only standard F.B.I. procedure pertaining to inventories and receipts is for property coming into an agent's possession as a result of a search and seizure or by voluntary consent conducted in the investigation of a crime. F.B.I. Manual, p. 429. (N.T. 93, 112)

(9) A type of receipt is given where requested for property received by an agent, such as school records obtained during an "applicant type background investigation" or when a City Directory is delivered to a Field Office, but this is considered to be an administrative function. (N.T. 100, 111, 116)

(10) In this case, the agents were following the normal search and seizure procedure when they searched the inside of the metal box and, in fact, gave the Bradleys the same form receipt that would be given to anyone upon whom a search warrant had been served. (N.T. 101, 102, 112)

(11) Furthermore, this procedure is designed for the purpose of preparing an inventory as required by law, Fed.Rules Cr.Proc. rule 41(d), 18 U.S.C.A., and for evidentiary reasons, such as establishing chain of custody for trial purposes. (N.T. 92, 97, 98, 106)

(12) Under Part II(E)(5) of the F.B.I. Manual, there must be no exploratory searches. (Government Exhibit # 1)

(13) The agents here were conducting an investigatory search into the contents of the box in order to discover evidence of a bank robbery and were not engaged in a routine or protective inventory search.

Further, I make the following additional findings, inasmuch as the issue of Rev. Bradley's motivation in summoning the F.B.I. was discussed by both Judge Maris and Judge Van Dusen.[3]

---

2. Agent Fanning was not immediately present when Agent Shields unlocked the box. (N.T. 97)

3. Contrast Judge Maris' language "We are in agreement with the rule applied by the Court of Appeals for the Second Circuit in the Botsch [*United States v. Botsch,* 364 F.2d 542] case, namely, that the right of the custodian of the defendant's property who has been unwittingly involved by the defendant in his crime *to exculpate himself promptly and voluntarily by disclosing the property and explaining his connection with it to government agents,* must prevail over any claim of the defendant to have the privacy of his property maintained against a warrantless search by such agents. . . . For here it was the custodian, Mr. Bradley, who first informed the agents at New Bern of the crime and of his suspicions about the box in his possession and who insisted that they come to his home immediately the same evening, *so that the box might be opened in their presence and the truth learned so that he might be exculpated."* [emphasis supplied]. 544 F.2d at 120 and 121, with that of Judge Van Dusen:

"(B) The record establishes that Rev. Bradley's 'main interest . . . was . . . to find out what was in the box,' *so that he could finally confirm or dispel his suspicions and concerns about his niece."* [emphasis supplied]

\* \* \* \* \* \*

"As noted in part I above, the record does not support the assertion that either Rev. Bradley's anxiety or his desire to see the contents of the box stemmed from a concern for his own legal position." 544 F.2d at 127, 132.

14. Rev. Bradley is Chrissey Mahone's maternal uncle, but their personal relationship was extremely close, much like a brother and sister. (N.T. 8, 9)

15. Rev. and Mrs. Bradley believed they had complete authority over the metal box when it was deposited with them. (N.T. 10, 11, 50) However, neither defendant nor Chrissey Mahone said anything to the Bradleys that would convey the impression that they had the right to open the box. (N.T. 78, 79)

16. When Rev. Bradley remembered that his niece, Chrissey Mahone, had left the metal box with him and his wife and, therefore, had lied to the F.B.I., he became upset that Chrissey had taken advantage of their close relationship (N.T. 21) and worried, more than anything else, that she may be in some trouble. (N.T. 30)

17. After praying over it for several days (N.T. 61), on January 23, 1975, Rev. Bradley discussed the matter with a personal friend, Charles Britt, and expressed his concern that Chrissey had two children and possibly could be in trouble and go to jail, whereupon Britt stated that it appeared to be a "rip off" and suggested that Rev. Bradley either call the F.B.I. or seek legal counsel. (N.T. 18, 26, 59)

18. While his primary concern continued to be Chrissey and their relationship, he now started to think seriously about the possibility of his own involvement. (N.T. 21, 31)

19. That same night, at approximately 11:30 P.M., Rev. Bradley called a lawyer, Hunt Baxter, Esq., and after some discussion, Mr. Baxter suggested that the best thing to do was for the lawyer to telephone the local F.B.I. office and Rev. Bradley acquiesced because he trusted the lawyer's judgment. (N.T. 27, 32, 34, 37)

20. Rev. Bradley insisted that the F.B.I. agents come to his home that very night because he was impulsive by nature (N.T. 63, 64) and wanted the agents to assist him, a citizen, in their official capacities, (N.T. 33) to find out the truth, i. e., what was in the box? (N.T. 21, 63, 64, 85)

21. His primary motivation was to determine whether Chrissey had lied to him (N.T. 23, 39) and what would happen to her (N.T. 65) and it was not to exculpate himself to law enforcement officers of involvement in a serious crime. (N.T. 23, 24, 26, 38) However, to a lesser degree, he was also concerned that he could possibly be implicated because he had possession of the box. (N.T. 43, 49, 61)

22. After their arrival at the Bradley home, the agents were very courteous and helpful and attempted in every way to cooperate with Rev. Bradley.

## DISCUSSION

As to the agents' purpose in searching the box, there appears to be little dispute. The agents were straightforward and credible and the thrust of their testimony was that they were engaged in an investigatory rather than an inventory search when they examined and removed the contents of the box. What they were looking for was evidence of a crime, viz., a bank robbery in Harrisburg, Pennsylvania. The locked box was turned over to them by Rev. Bradley for the limited purpose of ascertaining whether incriminating evidence was contained therein. If no such evidence was found, they would have returned the box and its contents and departed. They were in no way performing a caretaking function or conducting an inventory search to safeguard property coming into their possession. Moreover, the absence of a metallic sound and the appearance of the shifting of paper eliminated the presence of a firearm or explosive.

Because the question of Rev. Bradley's motivation in his insistence that the locked metal box be opened that very night was not uniformly interpreted by the Court of Appeals, I have made additional factual findings on that issue. The legal significance of his primary motivation will be for the Court of Appeals to decide. However, I went to great lengths to analyze his demeanor on the stand and to question him

carefully. In my original opinion, I describ-ed Rev. Bradley as an honest, law-abiding citizen who was anxious to cooperate in the investigation. *U. S. v. Diggs*, 396 F.Supp. 610, 613 (M.D.Pa.1975). The subsequent hearing only reinforced and solidified that judgment. I am convinced that he is a man of high principle and, while his own possible involvement may have troubled him, he was satisfied in his own mind that he had done nothing wrong and his most important ob-jective in summoning the F.B.I. was to get at the truth. His preoccupation with his niece's role, both as it affected their rela-tionship and the bank robbery itself, was exemplified by his explanation to the Agents, *prior to opening the box*, that he would call her and apologize if nothing in-criminating was found. 544 F.2d at 118–119. This would not be the attitude of one who feared his own implication; relief at being exonerated would be more appropri-ate. When I pressed him closely at the hearing, he became visibly agitated that I didn't seem to appreciate his concern for his niece.

> "It appears to me at this point in time that the Court finds it unrealistic for me to be that concerned about my niece. The way I feel about it either you have a relationship or you don't." (N.T. 65)

Accordingly, I conclude, after considering his testimony as a whole, that his primary concerns were his niece's involvement and the disappointment that she may have tak-en advantage of him. While he had some uneasiness relative to his own possible im-plication, I remain convinced that it was slight in the overall picture and that his request for the F.B.I. Agents was more in complying with the suggestions of Britt and Baxter that he pursue this course rather than an attempt to exculpate himself in the presence of law enforcement officials.

