Reuben K. RESMONDO, Sr., Plaintiff,

v.

UNITED STATES of America: Griffin B. Bell, Attorney General: M. Carr Ferguson, Assistant Attorney General, Tax Division: J. V. Eskenazi, United States Attorney: Jerome Kurtz, Commissioner of Internal Revenue: Frederick E. Hanby, Special Agent, Internal Revenue Service, Defendants.

Civ. A. No. 79–8166–CIV–CF.

United States District Court,
S. D. Florida.

June 3, 1981.

David Meisel, Palm Beach, Fla., for plaintiff.

Robert L. Welsch, Tax Div., Dept. of Justice, Washington, D. C., for Government.

## MEMORANDUM OPINION

FULTON, Senior District Judge.

The Plaintiff seeks suppression and return of certain business records alleged to have been illegally obtained by a special agent of the Internal Revenue Service.

Originally, this case was assigned to my brother judge, the Honorable William M. Hoeveler. On or about April 1, 1981, the cause was transferred to the undersigned for trial. It was tried to the Court without a jury on April 3, 1981. At the time of trial, the Court agreed to rule within ten days after receipt of an expedited transcript and submissions of counsel. During that period, the request for early disposition was withdrawn by counsel. Immediately after trial, the Plaintiff agreed that the action was solely against the United States and stipulated for the dismissal of the other Defendants.

## JURISDICTION

The key to this action, like all other Federal cases, is subject-matter jurisdiction. The specific jurisdiction which Plaintiff seeks to invoke is referred to by the cases as "Anomalous jurisdiction". Although firmly established in the circuit, anomalous jurisdiction is an exceptional jurisdiction, to be

exercised with caution and restraint. Anomalous jurisdiction does not exist by virtue of any statute but derives from the inherent authority of the Court over those who are its officers. In the context of this case, special agents of the Internal Revenue Service are considered to be officers of the Court. The subject just discussed has been elaborately treated by the Court of Appeals for the Fifth Circuit in the following cases: *United States v. Chapman*, 559 F.2d 402 (5th Cir. 1977); *Mason v. Pulliam*, 557 F.2d 426 (5th Cir. 1977); *Richey v. Smith*, 515 F.2d 1239 (5th Cir. 1975); *United States v. Mekjian*, 505 F.2d 1320, (5th Cir. 1975); *Hunsucker v. Phinney*, 497 F.2d 29 (5th Cir. 1974).

The cases cited recognize the existence of this unique jurisdiction in those cases where equity demands intervention by the court to prevent deprivation of constitutional rights by illegal activity of government agents. The jurisdiction, described as anomalous jurisdiction, is to be entirely governed by equitable principles and is to be exercised in the sound discretion of the district court.

In *Hunsucker* and *Richey*, supra, the Court of Appeals listed certain considerations to guide district courts in the exercise of anomalous jurisdiction. In those cases the Court said that "first and perhaps foremost" is the question of whether the Plaintiff accurately alleges and proves that in seizing private property, the government agent displayed a "callous disregard" for the constitutional rights of the Plaintiff. Other considerations which the Court listed were: whether the Plaintiff has an individual interest in and need for the return of his property; whether the Plaintiff will be irreparably injured by being denied the return of his property; and whether the Plaintiff has an adequate remedy at law for the redress of his grievance.

Thus, this Court is mandated to determine its jurisdiction and the relief to which the Plaintiff is entitled, if any, by an analysis of the evidence in the light of those equitable considerations. As stated, the first and most important of those considerations is whether the government agent act-ed with a callous disregard for Plaintiff's constitutional rights.

## FINDINGS AND CONCLUSIONS

The trial of this case required less than one day. The trial transcript consists of one hundred and forty pages. There were only three witnesses: Reuben K. Resmondo, Sr., the Plaintiff; Fredrick E. Hanby, Jr., the IRS special agent; Gloria June Savaikie, who was called by and testified for the Plaintiff. The testimony is conflicting in several particulars, which the Court will discuss and resolve later. A succinct description of the witnesses will be helpful as a general discussion of the evidence progresses.

The Plaintiff is a sophisticated and prosperous business man, who owns and controls a corporation, in the Florida Everglades, known as Evergreen Sod Farms, Inc. In addition, he has other interests, including a number of residential properties, one of which is a pretentious residence which he renovated during the period relevant to this controversy at a cost of two hundred thousand dollars or more. The records of those expenditures are significant to the resolution of this case.

Hanby is the IRS special agent, who is accused by Plaintiff of having illegally obtained Plaintiff's records. Although the records which will be discussed include both corporate records and the records pertaining to the improvement of the residence, Plaintiff's complaint of illegal seizure is restricted to the residence records.

Ms. Savaikie worked with Sam Adorno in his accounting business twenty years. She lived with him for some seventeen years, obviously out of wedlock. The evidence is unclear as to the relationship between Savaikie and the Plaintiff, but there is evidence which suggests that Savaikie did, at one time, work with Sam in the performance of his accounting duties for the Plaintiff. Sam was plaintiff's accountant.

Although Sam was not a witness, all of the facts revolve around him. Sam is now deceased, having died some time prior to

trial. Sam was comptroller of the corporation from 1971 or 1972 until September of 1976, at which time he was operated on for cancer. He was re-employed in December of 1976 and continued his employment until March of 1977. During the same period, Sam also served the Plaintiff in connection with Plaintiff's personal affairs. For example, he had possession of and balanced Plaintiff's check book, on a monthly basis; he looked after and kept tract of Plaintiff's personally owned rental properties; he assisted the Plaintiff in the preparation of the Plaintiff's personal financial statements; and he prepared Plaintiff's personal income tax returns. Sam was the informant from whom Hanby received records which pertained both to the corporation and the improvements on the residence.

On June 29, 1976, entirely unsolicited by IRS, Sam arrived at the IRS office with a substantial quantity of business records contained in a large black suitcase. Those records pertained to the corporate sod company operations, and although there is a conflict in the testimony, the court finds that the suitcase also contained records which pertained to improvements upon the residence. Hanby testified and the Court finds that in one section of the suitcase, there was a brown sack which contained a manila envelope and a number of file folders. Hanby testified that although he saw the manila envelope and the file folders in the suitcase, he was not then aware that they were records which reflected expenditures upon the residence. On that occasion, Hanby microfilmed some, but not all, of the corporate records and none of the personal residence records. He explained his failure to copy all of the records by stating that the records were voluminous and that he did not expect the visit from Sam and was quite busy on that day with other matters. He testified that he photocopied only a random number of the records, not all of them, because he was too pressed for time. Hanby transmitted the records which he copied to IRS superiors, with a request for their return along with copies of tax returns. Sam was interested in and inquired about a reward. Hanby explained the reward policy of the IRS and told Sam that if the information he was providing was accurate and useful, he would be entitled to a reward, in which event Hanby would recommend the maximum of ten percent. Hanby did not then or thereafter pay or promise to pay any money to Sam. During the conference, Hanby cautioned Sam not to take any records on behalf of Hanby because any such taking was illegal and could cause problems. At the conclusion of the conference, Hanby redelivered the suitcase to Sam with all of its contents intact. Hanby had no further contact with Sam until November 18, 1976.

Towards the middle of November, 1976, Hanby telephoned Sam and asked if he still had the records which he brought to the IRS office on June 29. Sam said that he did. Hanby asked if he could see them again. Sam agreed to return them which he did on November 18, 1976. The records were returned in the same black suitcase. On this occasion, Sam was accompanied by Savaikie, who did not attend the conference but left as it began. Sam left the records with Hanby for an hour or so, while Sam attended to matters elsewhere. While Sam was away, Hanby microfilmed all of the records, the corporate records and the residence records. It was Hanby's testimony that on November 18 he received the same records which were brought to him on June 29, including those records which were contained in a manila envelope and in the file folders. Hanby testified that when he examined and photocopied these records, they were found to be records which reflected expenditures upon the residence. He testified positively that the same manila envelope and file folders were in the suitcase on June 29. On November 18, Hanby asked Sam if the records could be returned to Plaintiff's office so that they could be subject to a summons if an investigation was instituted. Hanby opined their absence might indicate the identity of the informant, which was a matter of much concern to Sam. Sam stated that he could not return the records because the corporate records had been taken in small quantities

over a period of time and that it would be very obvious that Sam took them if he returned them all at once. Sam declined to return the records. There is evidence and the Court finds that Sam removed the residence records from a credenza in Plaintiff's office in a single removal. On November 18, Hanby again admonished Sam not to take any more records because if he did, it might appear that the records were taken at Hanby's direction. At the conclusion of the November 18 conference, the suitcase with all papers intact was redelivered to Sam, who took the suitcase with him when he departed. There is no record of any further contact between Hanby and Sam until early January of 1978.

On January 4, 1978, Hanby interviewed a Mr. Gould, who was the contractor to whom Plaintiff paid some two hundred thousand dollars for improving the residence. A few days prior to that interview, Hanby telephoned Sam and inquired if Sam still had the records relating to the residence. Sam answered in the affirmative and agreed to produce the residence records again. Hanby testified that he requested Sam to bring the residence records because he wanted to show Gould the original records rather than the microfilms. He said it was necessary to identify signatures and the microfilms were of rather poor quality. Hanby testified and the court finds that he compared the original residence records with the microfilms which he made on November 18, 1976, and that they were exactly the same. Hanby testified that on this third occasion, he again warned Sam not to take any more records and pointed out the problems that could develop if he did so. Hanby stated that it was IRS policy and his practice to caution each informant on each occasion. After the interview with Gould, the residence records were returned to Sam. There is no evidence that Hanby has seen any of the original records since that time. Nor is there any evidence as to where Sam kept these records, or where they are at this time. The Plaintiff testified that he has not seen any of the records since their disappearance.

Although the reason why Sam blew the whistle on Plaintiff is not important to the resolution of this case, the court finds that there were two reasons, one of which was the acrimony that existed in early June of 1976 when Plaintiff accused Sam of embezzlement and other defalcations. The other was Sam's apprehension that Plaintiff would charge him with being the catalyst of a state sales tax investigation, which was in progress at that time, coupled with Sam's refusal to obey Plaintiff's order to destroy business records which were pertinent to that investigation.

Earlier, the court mentioned conflicts in the testimony. The Testimony of Savaikie is in sharp conflict with that of Hanby in certain particulars. Hanby testified that on both June 29 and November 18, 1976, the residence records were in the suitcase that Sam brought; and that he, Hanby, photocopied the records, including the residence records on November 18. Both Hanby and Savaikie testified that she did not go with Sam to the IRS office on June 29, but she testified that the residence records were not in the suitcase on June 29 and that they were not taken to Hanby on November 18. She further testified that on November 18, Hanby asked Sam if he could get the records and that Sam said "I can get you any damn thing you want". Yet, both Hanby and Savaikie testified that, although she went to the IRS office with Sam on November 18, she was requested to leave the room and was not present during the conference. As far as the evidence shows, the first contact between Hanby and Savaikie was on November 18, 1976. Apparently, Savaikie voluntarily testified for the Plaintiff. She was not under a subpoena. A number of depositions were taken, hers was not. She was not listed as a witness on the pretrial stipulation, which was obviously prepared by the Plaintiff. The local rules of the court require that the names of witnesses appear on the pretrial stipulation. For reasons that were not revealed, nor apparent, she was obviously biased in favor of the Plaintiff. Her description of Sam's vindictive nature and her unnecessary repetition of the vulgarity of his speech not only

discredited him, but certainly did not portray her as a loyal and bereaved paramour. Her testimony is not credible. The Court accepts the testimony of Hanby and rejects the testimony of Savaikie.

 The Plaintiff testified that the residence records were in a credenza behind his desk in June, and also in middle August of 1976. If this testimony is credible, and there is nothing in the record to completely contradict it, and if the testimony of Hanby that the manila envelope and the file folders were in the suitcase when it was presented to him on June 29, 1976 is credible, as the court finds it to be, then Plaintiff's contention that the residence records were taken from the credenza at least twice is sustained; but even so, the Plaintiff has not proved that the residence records were illegally obtained by the government. It affirmatively appears that the records were removed by Sam without any participation, active or tacit, on the part of Hanby or anyone else representing the government. The illegal removal of the records by Sam cannot be imputed to the government because the Fourth Amendment was intended as a restraint on activities of the government and its agents and is not addressed to actions, legal or illegal, of private parties where no official of the government has any connection with the wrongful seizure or any knowledge of it until after the fact. See *Mekjian* and the other cited cases, supra.

Certainly, Hanby's response to Sam's inquiry about a reward and Hanby's agreement to recommend Sam for a maximum reward if the information which he was providing was accurate and helpful does not constitute prohibited government participation and does not render the government culpable in any way with respect to Sam's illegal taking of the records. This record supports the conclusion that if there was a second taking, it was done without any participation on the part of Hanby and was done without his approval or knowledge. Plaintiff's contention that Hanby had knowledge of a so-called "second taking" and somehow participated in it, has no support other than surmise and speculation. The Court, therefore, finds and concludes that even if there was a second taking, the government had no hand in it, and is not responsible for it and that Plaintiff's prayer for relief must be denied.

At the beginning, during and at the end of the trial, the government renewed its Motion for Dismissal and/or Summary Judgment. Because jurisdiction is always an open question, ruling was deferred and the Motion was carried with the case. The trial produced no evidence that Hanby in any way displayed a callous disregard for the constitutional rights of the Plaintiff, nor was there evidence to support or justify Plaintiff's right to equitable relief on any of the other grounds specified in Hunsucker.

### ORDER

For the reasons stated, Plaintiff's Complaint shall be and it is hereby dismissed, at the cost of, but without prejudice to Plaintiff. Counsel shall promptly prepare and submit to the Court a Judgment of Dismissal in conformity herewith.