**OKC CORP.**

v.

**Harold WILLIAMS, John R. Evans, Philip A. Loomis, Jr., Irving M. Pollack and Robert S. Karmel, Individually and as Commissioners of the Securities and Exchange Commission, Richard M. Hewitt, Cecil S. Mathis, Wayne M. Whitaker, Benjamin F. Simms, Jr., Kathleen N. Stewart, Theodore A. Levine, Edward D. Herlihy, Steven K. McGinnis and David A. Watson, Individually and as officers and employees of the Securities and Exchange Commission and the Securities and Exchange Commission, an Agency of the United States of America.**

Civ. A. No. CA–3–78–1021–G.

United States District Court,
N. D. Texas,
Dallas Division.

Nov. 22, 1978.

George B. Davis of Brice & Barron, Dallas, Tex., John J. Witmeyer, III, and Richard B. Marrin of Ford, Marrin, Esposito, Witmeyer & Bergman, New York City, Arthur Mitchell, Gen. Counsel, Robert A. Miller, G. Scott Damuth, OKC Corp., Dallas, Tex., for plaintiff.

Michael J. Stewart, Regional Administrator, Walter E. Keller, Jr., of counsel, SEC, Fort Worth, Tex., James H. Schropp, Asst. Gen. Counsel, SEC, Washington, D. C., for Cecil Mathis, David A. Watson and Steven K. McGinnis.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This is a clash between a New York Stock Exchange listed company and its principal regulator, the Securities Exchange Commission. In a self-policing effort, OKC employed outside legal counsel to gather information and give advice regarding a situation viewed as a potential problem by its board of directors. Counsel prepared a report, the contents of which were to be held in confidence, but have fallen into the hands of the SEC. Thus the effort at self-regulation has failed and the potential problem has shifted in its focus. The core of this fight is the use by the SEC of this report.

### Facts

In early 1978, the SEC obtained the report which the Dallas law firm of Locke, Purnell, Boren, Laney & Neely prepared for OKC. How this report came to the Commission is unclear. (McGinnis affidavit, August 15, 1978, p. 5; Mathis affidavit, September 5, 1978, p. 5; OKC memorandum, September 29, 1978, pp. 4–5; Mitchell affidavit, August 29, 1978, p. 4). When the SEC became aware of its existence, or of the internal OKC investigation is also contested. (SEC memorandum, September 25, 1975, pp. 2–9; OKC memorandum, September 29, 1978, pp. 5–7, 13.) In any event, on March 27, 1978, the Commission entered an order appointing certain of the individual defendants as officers of the Commission for the purpose of conducting a private investigation to determine whether OKC, Cloyce K. Box, chief executive officer and chairman of the board of OKC, and others have violated antifraud and filing provisions of the Securities Exchange Act of 1934. After the SEC inquiry was underway, OKC lodged with the Commission a motion to halt the investigation. OKC director John Kelsey, the First City National Bank of El Paso and OKC also filed motions to quash subpoenas duces tecum. On August 15 and 16, 1978, the Commission com-

menced in the United States District Courts for the Western and Northern Districts of Texas and the Northern District of Oklahoma actions to compel compliance with the subpoenas.

The Commission learned during the summer of 1978 that Ghaith Pharaon was contemplating a tender offer to purchase OKC common stock. Specifically how and when it learned is disputed. (SEC memorandum, September 25, 1978, p. 11; McGinnis affidavit, September 21, 1978, p. 4; OKC memorandum, September 29, 1978, pp. 11–12; Mitchell affidavit, August 29, 1978, pp. 5–7.) Officers of the Division of Enforcement scheduled a meeting with Pharaon's representatives in Washington, D. C. For reasons yet unresolved, the Commission staff advised Pharaon's representatives of the SEC investigation. Whether other matters were discussed with Pharaon is disputed. (Miller affidavit, September 28, 1978, p. 3, Exhibit B; Herlihy affidavit, pp. 6–7, and attached exhibit.)

In late June, 1978, OKC requested from the SEC's Freedom of Information Act officer all documents relating to the Commission's OKC investigation. The Commission extended through July 21, 1978, its time to respond and on July 20, 1978, refused the request. OKC filed no additional administrative requests.

On August 15, 1978, OKC filed with this court a lengthy complaint in which it charged that defendants are:

1. Conducting an investigation which allegedly is "without the jurisdiction of the Commission and flouts the will of Congress";

2. Conducting the investigation based upon a report allegedly covered by the attorney-client privilege and unlawfully obtained from OKC in violation of OKC's fourth and fifth amendment rights;

3. Conducting the investigation pursuant to the Commission's rules relating to investigations, 17 C.F.R. 203, which, it is alleged, violate OKC's fifth amendment due process rights;

4. Allegedly intimidating witnesses and otherwise conducting the investigation in bad faith; and

5. Causing plaintiff, its officers, directors, agents, employees, shareholders, and customers irreparable injury.

In addition, OKC alleges:

1. That the SEC has violated the Privacy Act of 1974, 5 U.S.C. 552a(b) (hereinafter referred to as the Privacy Act), by providing to and receiving from various government agencies and other persons information relating to OKC;

2. That the defendants violated the Privacy Act, §§ 14(e) and 24(b) of the Securities Exchange Act of 1934, and OKC's fifth amendment rights by disclosing the existence and nature of the Commission's investigation to Pharaon's representatives and by requesting Pharaon not to proceed with the tender offer; and

3. That the defendants have conspired to violate the Freedom of Information Act, 5 U.S.C. 552 (hereinafter referred to as FOIA), as well as the Commission's rules relating thereto, by denying, without adequate grounds, OKC's FOIA request for all records relating to the investigation of OKC, all in violation of OKC's fifth amendment due process rights.

Based upon these allegations, OKC requested this court:

A. Temporarily and permanently to enjoin the Commission's investigation of OKC and enjoin SEC from commencing or recommending any proceeding based upon the investigation, information derived from the investigation, or information upon which the investigation is based;

B. In the event that it denies A. above, order that the investigation be conducted under trial-like procedures, that the defendants stop conducting the SEC's investigation in furtherance of any investigation being conducted by the federal Department of Energy or any other agency, that the defendants cease intimidating witnesses in the investigation, and that certain witness testimony be suppressed;

C. Declare the Commission's order of investigation "unauthorized, invalid, and void" and declare the SEC's Rules Relating to Investigations unconstitutional;

D. Order the SEC to grant OKC's FOIA requests;

E. Order the defendants to surrender to OKC all reports, files, and other records of OKC, which, without the consent of OKC, are in the possession of the defendants, and enjoin the defendants from disclosing or using such reports, records, or files in or as the basis of any investigation or other proceeding;

F. Enjoin the defendants from disclosing to or receiving from any agency or person records of or records pertaining to OKC in violation of the Privacy Act, § 24(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78x(b), or 18 U.S.C. § 1905; and

G. Award the plaintiff $15,000,000 in damages.

Following an August 25, 1978, status conference with the parties, this court issued an order on August 29, 1978, which restrained the SEC's use of the Locke, Purnell report and ordered expedited discovery regarding "the circumstances applicable to the SEC's receipt, acceptance, and use of such report as the basis for its proceedings with respect to OKC Corp." The SEC conceded that it could not proceed if its use of the report was enjoined and all parties consented to the order to preserve the status quo.

The order enjoining use of the report pending completion of expedited discovery was premised on the concession of counsel that there was no dispute as to the privileged status of the report. It was then envisioned that this discovery could be completed in less than thirty days. On August 31, 1978, the parties scheduled depositions of two defendants for September 11, 1978. On September 5, 1978, however, the SEC's Washington office disavowed the concession and withdrew from the agreement negotiated by its Fort Worth, Texas, office and filed with the court an application for protective order, or, in the alternative, a motion for postponement for discovery.

On September 5, 1978, the court ordered the report sealed.

On September 6, 1978, the court held a status conference in which in an effort to expedite discovery it probed the scope of factual disputes by inquiring into possible stipulations of facts. The court inquired if the SEC contested OKC's claims that:

1. The Locke, Purnell report was subject to the attorney-client privilege in the hands of OKC;

2. OKC had not waived the attorney-client privilege; and

3. The motive of the persons who provided the report to the defendant is irrelevant to a determination of the claim that the SEC's use of the report must be barred.

The SEC asked for time to consider the proposed stipulations and agreed not to pursue its investigation in the meantime. The SEC advised that it did contest those claims and on September 21, 1978, asked the court to continue the status quo pending resolution of a planned motion challenging the court's subject matter jurisdiction. The SEC then filed with this court on September 25, 1978, a 47-page memorandum, accompanied by lengthy affidavits and exhibits. On September 29, 1978, OKC submitted an equally voluminous response.

### The SEC's Motion

The SEC's motion deals only briefly with jurisdiction. It actually represents an attempt to have this court dismiss each of OKC's claims on the merits. Several of its objections may be classified as Rule 12(b)(6) motions to dismiss for failure to state a claim on which relief can be granted. The bulk of its arguments, however, are motions for summary judgment. The SEC asserts that its recitation of events and affidavits resolve any fact questions presented in its summary judgment motions and argues that OKC has failed to prove its case. As discussed at length below, at this point in the case, summary judgment on many of these complaints is singularly inappropriate. *Littlejohn v. Shell Oil Company*, 456 F.2d

225, 229 (5th Cir. 1972), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973). Rule 56(f), Fed.R.Civ.P. permits the court to defer ruling on a motion for summary judgment and "to permit affidavits to be obtained or depositions to be taken or discovery to be had." Should this court grant the motions for summary judgment, it would deprive OKC of its right fully to present its own position.

The court remains of the opinion (as held in the first conference with counsel) that the case will proceed most effectively in two phases—Phase I, the report, and Phase II, all other matters. It will conduct the proceeding in that sequence. This is logical because the SEC concedes that without use of the report, it cannot proceed. Moreover, there is little overlap in the discovery necessary to a resolution of this question and the remaining claims. This order, however, will address certain matters properly in Phase II. The court has chosen to do so at this time because their disposition may simplify the proceeding and enable the parties to concentrate their efforts on the remaining serious and complex issues.

### Jurisdiction

■ Generally, unless it has exhausted prescribed administrative remedies, a party involved in an administrative proceeding is not entitled to judicial relief. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *Frito-Lay, Inc. v. Federal Trade Commission*, 380 F.2d 8 (5th Cir. 1967). Complaints that an agency is violating either specific statutory language or constitutional rights, however, are excepted from this general rule. *Coca-Cola Company v. Federal Trade Commission*, 475 F.2d 299 (5th Cir. 1973), *cert. denied*, 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973); *see, e. g., Breen v. Selective Service Board*, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970); *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). It is well settled that when a complaint is so drawn as to seek recovery directly under the constitution or laws of the United States, the federal court with

rare exception must entertain the suit. *Bell v. Hood*, 327 U.S. 678, 681–82, 66 S.Ct. 773, 90 L.Ed. 939 (1945). Where, however, plaintiff's claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," the federal court must dismiss it for want of jurisdiction. *Id.*, 682–83, 66 S.Ct. at 776. In *Coca-Cola Company v. Federal Trade Commission, supra*, the Fifth Circuit warned that a claim does not confer jurisdiction merely because it is framed in conclusory language of a denial of due process.

■ OKC complains that in obtaining and using the Locke, Purnell report, the SEC violated OKC's fourth and fifth amendment rights, and that in conducting the investigation the SEC is depriving OKC of due process. The fourth amendment complaint and the due process complaint concerning the investigation raise not insubstantial questions of constitutional infringement and are matters over which this court has jurisdiction. OKC's fifth amendment allegation concerning use of the report, however, is precisely the sort of conclusory due process complaint against which, in *Coca-Cola Company v. Federal Trade Commission, supra*, the Fifth Circuit warned. In that case the plaintiff contended that if the court did not enjoin the FTC's proceedings, Coca-Cola would be forced to defend multiple lawsuits and would risk inconsistent decrees. Plaintiff argued that such a result would violate its due process rights. The court rejected Coca-Cola's position and emphasized that "the 'right' to be free from defending a multiplicity of lawsuits is not a statutory right, not a constitutional right and, in the context of the present case, not a right at all but an equitable principle." 475 F.2d at 304. Similarly, the attorney-client privilege, the root of OKC's due process claim, is not a principle of constitutional proportions but a rule of evidence. While unquestionably valued and significant, the attorney-client privilege has not been elevated to the stature of a constitutional right. It is a claim over which this court does not have jurisdiction.

*Motions to Dismiss*

A. *Monetary Damages*[1] *and the Fourth Amendment.*

The Supreme Court has firmly established that a citizen suffering injury from an invasion of his fourth amendment rights may obtain from the responsible federal official an award of monetary damages. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The SEC contends, however, that its officials have absolute immunity from such liability, and relies for support on *Butz v. Economou*, —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In that case the Supreme Court stated:

'[The] officers of the government from the highest to the lowest are creatures of the law, and are bound to obey it' . .
We therefore hold that, in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunities specified in *Scheuer [v. Rhodes*, 416 U.S. 232, [94 S.Ct. 1683, 40 L.Ed.2d 90] (1974)], subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business. *Id.*

The court held that the measure of an "exceptional" situation was the law of immunities which governs cases under 42 U.S.C. § 1983. Justice White stated that agency officials who perform functions analogous to those of prosecutors, who decide to initiate or continue adjudicatory proceedings are, like prosecutors, "entitled to absolute immunity from damages liability for their parts in that decision." *Id.* As it did in *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the court left open the question of whether

a prosecutor is absolutely immune for acts committed in his investigative capacity. —— U.S. —— n.37, 98 S.Ct. 2894. (*Imbler* held prosecutors sued under § 1983 for damages arising from actions committed in their adversary rather than investigative role have absolute immunity.) Circuit courts have addressed this open issue, however, and have held that a prosecutor's absolute immunity does not extend to acts done while investigating. *Guerro v. Mulhearn*, 498 F.2d 1249, 1256 (1st Cir. 1974); *Hampton v. Chicago*, 484 F.2d 602, 608–09 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1973); *Robichaud v. Ronan*, 351 F.2d 533, 537 (9th Cir. 1965). *See, Madison v. Purdy*, 410 F.2d 99 (5th Cir. 1969); *Lewis v. Brautigam*, 227 F.2d 124 (5th Cir. 1955) [in which the Circuit held that a prosecutor cannot claim immunity for acts committed outside the scope of his jurisdiction and without authorization of law].

[7] This appellate authority is persuasive. If SEC officials in their adversary capacity committed the acts of which plaintiff complains and those acts violated the fourth amendment, then the immunity to which they are entitled is absolute. If on the other hand they committed those acts in their investigative role, then they may claim qualified immunity. In the latter case, only if they acted in good faith can they escape liability.[2] Until this court determines in Phase II of this case whether the SEC's seeming investigatory proceedings are actually adjudicatory, the question of whether the officials are entitled to absolute or qualified immunity cannot be fully resolved. A finding that the inquiry is in fact an adjudication will mean that the individual defendants are entitled to absolute immunity for some of the acts they committed, but not all. There can be little

---

1. Plaintiff alleges that it suffered damages in the amount of $15,000,000 but does not state which of the defendants' acts of which OKC complains caused this great loss. The court will inquire into whether the complaint can support a claim for monetary relief.

2. This law of qualified immunity places both OKC and the SEC in difficult positions. It puts

OKC in the posture of arguing on the one hand that the SEC officials were functioning in their investigatory capacity and on the other that the SEC's investigatory procedures are actually adjudicatory. Conversely, the SEC must argue that its officials have been acting in their advocate's role, and yet that its proceedings are merely investigatory.

question that until the officials decided to initiate the challenged proceedings, they were merely investigating OKC. As to these actions, the question of their good faith arises. Because the question is one of fact, it may not at this time be decided. Rather the parties need the opportunity for discovery.

## B. *The Exclusionary Rule.*

The SEC argues that in asking this court to exclude the Locke, Purnell report from SEC proceedings, OKC has failed to state a claim on which relief may be granted. It contends that the exclusionary rule cannot be invoked in SEC investigative proceedings, and relies for support on *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). In that case the Supreme Court refused to extend the exclusionary rule to a civil proceeding instituted by the federal government and to bar the use of evidence illegally seized by a state criminal law enforcement agency. The court reasoned that the application of the exclusionary rule to federal and state criminal proceedings provided adequate deterrence, and that the societal costs of excluding concededly relevant evidence from civil cases outweighed whatever additional, marginal deterrence would result. Arguably, neither rationale applies here.

Justice Blackmun in *Janis* emphasized that the primary purpose of the exclusionary rule is " 'to deter future unlawful police conduct.' " *Id.*, 428 U.S. 446, 96 S.Ct. at 3028.[3] When the officer who commits the unconstitutional search or seizure has no responsibility or duty to, or agreement with the sovereign seeking to use the evidence, "the deterrent effect of the exclusion of relevant evidence is highly attenuated." *Id.*, 458, 96 S.Ct. at 3034. The desired deterrence can only result from excluding evidence from a case in which the officer is an agent of the sovereign seeking to use the evidence. *Id.* The court in *Janis* specifically observed that the facts of that case did not raise the question of such an intrasovereign violation. *Id.* at 455–56, n.31, 96 S.Ct. 3021. This case, however, appears to present precisely that circumstance. The individuals whom OKC accuses of violating its Fourth Amendment rights are all officers and employees of the SEC. Their duty is to the Commission alone. The SEC and no other sovereign is now seeking to use the report as evidence. Under *Janis*, therefore, the deterrent impact of applying the exclusionary rule to this report in these proceedings is in no way attenuated; its force is not incremental but primal.

The court in *Janis* emphasized that the existence of other more directly felt sanctions—specifically, the exclusion of the evidence from both state and federal criminal prosecutions—rendered the additional civil application of the rule unnecessary. Again, *Janis'* logic is inapposite to this case. If the defendants are able to use this report in the investigation, there is no certainty that any situation will arise in which other deterrent sanctions will be imposed. First, after the investigation, the SEC might not initiate further proceedings in which the rule could apply. It may discover during the investigation either that no probable cause exists to justify an enforcement action, or that criminal proceedings, which the Commission is not empowered to prosecute are appropriate. Second, while it is true that the defendants may turn the report over to other governmental agencies or departments, including the Department of Justice,[4] the applicability of the exclusionary rule to proceedings initiated by such other entities is unresolved.[5]

The SEC also relies on *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38

---

**3.** "The rule is unsupportable as reparation or compensatory dispensation to the injured criminal; its sole rational justification is the experience of its indispensability in 'exert[ing] general legal pressures to secure obedience to the Fourth Amendment on the part of law-enforcing officers.' " *Id.* at 454–55, n.29, 96 S.Ct. at 3032, quoting Amsterdam, *Search, Seizure and*

*Section 2255: A Comment*, 112 U.Pa.L.Rev. 378, 388–89 (1964).

**4.** We raise this possibility without deciding it.

**5.** Indeed, the logic of *Janis* would indicate that the rule might not apply.

L.Ed.2d 561 (1974). In that case the Supreme Court held that the exclusionary rule should not be extended to grand jury proceedings. It reasoned that the grand jury does not adjudicate but merely investigates to determine probable cause. Invocation of the exclusionary rule would impede the orderly progress of the grand jury investigation and result in preliminary trials on the merits. Analogizing grand jury proceedings to its own investigation, the SEC contends that the exclusionary rule has no place in its inquiry into possible OKC wrongdoing.

■ A motion to dismiss requires the court to look only at the face of the pleadings. The SEC misreads OKC's complaint. That complaint unequivocally alleges that the SEC's investigations are actually adjudications. The SEC does not and could not contend that *Calandra* applies to adjudications. Taking OKC's complaint as true, this court must find that OKC does state a valid claim. If in Phase II this court finds that the SEC's proceedings are investigatory rather than accusatory, however, the SEC should resubmit as a Rule 56 motion its contention that OKC cannot invoke the exclusionary rule and the court will reconsider the applicability of *Calandra*.

### C. *Monetary Damages and Due Process.*

■ OKC alleges that the SEC, by conducting an accusatory inquiry without procedural safeguards and by disclosing information to Pharaon's representatives, violated its fifth amendment due process rights. These complaints cannot support a claim for monetary relief. The Fifth Circuit sitting *en banc* recently ruled that no right of action for monetary damages may be implied from the due process clause of the fifth amendment. *Davis v. Passman,* 571 F.2d 793, 801 (5th Cir. 1978). Accordingly, to the extent that these claims seek monetary relief, they are dismissed.

6. The FOIA only permits a court to award reasonable attorneys' fees or other litigation costs reasonably incurred. 5 U.S.C. § 552(a)(4)(E).

### D. *Section 14(e).*

■ OKC also claims that during their meeting with Pharaon's representatives, the individual defendants violated § 14(e) of the Securities Exchange Act. Section 3(c) of the Securities Exchange Act, 15 U.S.C. § 78c(c), excepts from its reach officers or employees of the Commission acting in the course of their official duties. All of the individual defendants are officers and employees of the Commission who are being sued for actions taken in the course of their official duties. The mere fact that OKC alleges that these defendants violated the law does not remove them from the protection of § 3(c). OKC's claim under § 14(e) of the Securities Exchange Act is therefore dismissed for failure to state a claim.

### E. *FOIA.*

■ OKC has alleged a violation of the FOIA, 5 U.S.C. § 552. That statute will not support a private right of action other than one against a federal agency. *See* 5 U.S.C. § 552(a)(4). Accordingly, under that Act OKC does not state a claim for money damages against the individual defendants. Thus, to the extent that OKC's FOIA claim is directed to the individual defendants, it is dismissed. This court cannot grant the SEC's motion to dismiss OKC's FOIA complaint against the agency, however. Whether the SEC timely complied with OKC's request for documents and whether these documents are exempted from disclosure are both disputed issues which cannot be resolved by examining the face of the pleadings. *See, e. g., Pacific Architects & Engineers, Inc. v. Renegotiation Board,* 164 U.S.App.D.C. 276, 278, 505 F.2d 383, 385 (1974). In Phase II of this proceeding, if either party believes summary judgment is appropriate on this point, each should submit whatever evidence and arguments it deems necessary.[6]

### F. *The Privacy Act.*

■ OKC also alleges that the defendants violated the Privacy Act of 1974, 5

Thus, OKC must find some other alleged violation to support its damage claim for $15,000,-000.

U.S.C. 552a, by providing information to and receiving information from the Department of Energy and other agencies, and by disclosing the existence of the OKC investigation to Pharaon. Because the Privacy Act does not grant protection to corporations, these allegations must be rejected as failing to state a claim upon which relief can be granted. An "individual" is defined by the Act as a "citizen of the United States or an alien lawfully admitted for permanent residence." 5 U.S.C. § 552a(a)(2). "This definition is intended to distinguish between the rights which are given citizens and individuals under this Act as opposed to the rights of proprietorships, businesses, and corporations which are not intended to be covered by the Act." Office of Management and Budget, Privacy Act Guidelines, 40 Federal Register, No. 132, p. 28951 (July 9, 1975). Similarly, in *Stone v. Export-Import Bank of the United States*, 552 F.2d 132 (5th Cir. 1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), the Fifth Circuit noted that the Senate Report regarding the Privacy Act stated that the "term ['individual'] is used instead of the term 'person' throughout the bill in order to distinguish between the rights which are given to the citizen as an individual under this Act and the rights of proprietorships, businesses and corporations which are not intended to be covered by this Act." 552 F.2d at 137, n.7. Accordingly, OKC's Privacy Act complaint is dismissed for failing to state a claim upon which relief can be granted.

### Motion to Strike

 The SEC has filed a motion to strike OKC's claims arising out of the meeting between Commission personnel and the representatives of Ghaith R. Pharaon. Specifically, the SEC contends that paragraphs 15 and 16 of OKC's complaint are impertinent and scandalous. An impertinent pleading is one that is immaterial. *Mitchell v. American Tobacco Company*, 28 F.R.D. 315 (D.C.Pa.1961). Scandalous matters are those casting an excessively adverse light on the character of an individual or party. *Budget Dress Corporation v. International Ladies Garment Workers Union, AFL–CIO*, 25 F.R.D. 506, 508 (S.C.N.Y.1959). Motions to strike are disfavored and rarely granted. *Augustus v. Board of Public Instruction*, 306 F.2d 862 (5th Cir. 1962). Unless the matter of which the movant complains bears no possible relation to the controversy or may cause the objecting party prejudice, such motions should be denied. *Id.*

 In determining whether a party's pleading is impertinent or scandalous, a court should view all well-pleaded facts in their most favorable light. *Budget Dress Corp. v. International Ladies Garment Workers Union, AFL–CIO, supra*. The SEC has not shown and indeed does not contend that OKC's pleadings concerning SEC's contact with Pharaon are on their face scandalous or impertinent or that they have caused any prejudice. When taken as true, the challenged paragraphs are certainly relevant to OKC's claims and do not contain the extreme sort of accusation that unnecessarily reflects adversely on the defendants. Instead, despite the general rule that in deciding motions to strike a court should not consider matters outside the pleadings, the SEC wants this court to look beyond the complaint. *Ciprari v. Servicos Aeros Cruzerio do sul*, 245 F.Supp. 819 (S.D.N.Y.1965), *aff'd on other grounds*, 359 F.2d 855 (2nd Cir. 1966). *See*, Wright & Miller, *Federal Practice & Procedure* § 1380 (1966). Furthermore, a disputed fact question cannot be decided on a motion to strike. *Augustus v. Board of Public Instruction, supra*, at 868. The SEC nonetheless has submitted for this court's consideration various affidavits and letters. Acknowledging that the court halted all discovery in this action, the SEC criticizes OKC for not coming forward with any firsthand controverting information. Because this case has not yet progressed beyond the pleading stage, the fact issues that OKC raises in its complaint and that SEC contests in its memorandum, affidavits, and letters in support of this motion must be considered to be disputed. The motion to strike therefore is denied. After the parties have completed discovery on this issue, however, the SEC is free to

resubmit its arguments in the form of Rule 56 motion for summary judgment.

### The Fourth Amendment: Summary Judgment

The SEC asserts that it is entitled to summary judgment on OKC's claim that in obtaining and using the Locke, Purnell report, the SEC violated OKC's fourth amendment rights. We reach this question only because we reserved the issues, *supra*, of whether OKC in seeking monetary damages and the application of the exclusionary rule, states claims on which relief may be granted. If the SEC is correct, and there has been no constitutional violation, then this court need not later resolve those issues of remedy. In determining whether summary judgment is appropriate, this court must undertake a two-step analysis. First, it must establish whether there are any set of circumstances supporting plaintiff's complaint under which the SEC could have violated OKC's fourth amendment rights. If there are no such circumstances, then the SEC is entitled to summary judgment. If, however, the SEC could have violated the fourth amendment, the court must then decide whether the parties have presented facts sufficient to prove the SEC's actual role in the report's seizure.

 The fourth amendment protects private citizens from unreasonable governmental searches and seizures. It does not shield persons from the intrusions of private parties. If a private individual turns a seized item over to a government entity whose officials have no connection with or knowledge of the seizure until after it occurs, then the fourth amendment has not been violated. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1975). A federal official who actively participates in a private party search,

or stands by watching it with approval and then reaps its benefits, however, implicates the federal government. Such conduct intrudes on the victim's fourth amendment rights. *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *United States v. Mekjian, supra.* A private party search conducted under the active supervision of the governmental authority is equally unconstitutional. *United States v. Mekjian, supra.*

 As governmental connection with the search becomes more attenuated, the precise point at which the fourth amendment violation occurs becomes increasingly difficult to determine. The Fifth Circuit in *United States v. Mekjian, supra*, established the point at which the government is unconstitutionally involved in a search. If a government official either knew or should have known at the time of its occurrence that a private party search was to be conducted, the government cannot accept its benefit. 505 F.2d at 1328. Thus under *Mekjian*, if any SEC official knew or should have known at the time of the seizure's occurrence that the informant was obtaining the Locke, Purnell report, then the SEC violated OKC's fourth amendment rights.

OKC relies on *Knoll Associates, Inc. v. Federal Trade Commission*, 397 F.2d 530 (7th Cir. 1968) to support its claim that even after-the-fact governmental approval of a private party search violates the Fourth Amendment. It thus overlooks the Fifth Circuit holding in *Mekjian* which is directly contrary to OKC's proffered distillate of *Knoll*. *Mekjian* specifically held that absent the government's actual or implicit knowledge of a seizure at the time that it was occurring and absent governmental encouragement and cooperation, the fourth amendment is not violated. 505 F.2d at 1328. Furthermore, although *Knoll* is less than lucid on this point,[7] the Fifth Circuit

---

7. In *Knoll*, Prosser, an employee of Knoll's sales representative, purloined from Knoll an incriminating document for the purpose of assisting the FTC in a proceeding against Knoll. At some point, Prosser telephoned the FTC and informed the agency that he had information

that would "hang" Knoll. *Id.* at 532. The Seventh Circuit did not make clear, however, whether Prosser made this phone call before or after he seized the documents. Although there apparently was no evidence that the FTC participated in the theft or even requested that

has not read that case as broadly as OKC would like. Rather, in *Mekjian*, the court cited *Knoll* for the narrower proposition that if *at the time* a private party search and seizure occurs the governmental official knows of and consents to it either tacitly or explicitly, then even .though the official removes himself from the scene of the search, the fourth amendment is violated. *Id.*

OKC urges that if the Locke, Purnell report is privileged, a more rigorous fourth amendment standard applies than is appropriate to those cases involving unprivileged materials. It relies on *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), in which the Supreme Court held that a county sheriff's warrantless seizure of a sexually explicit film at a local drive-in theatre violated the fourth amendment, not because he could easily have obtained a warrant, but because his actions constituted a form of prior restraint on expression. Chief Justice Burger stated that an intrusion into first amendment rights

> calls for a higher hurdle in the evaluation of reasonableness. The setting of the bookstore or the commercial theatre, each presumptively under the protection of the First Amendment, invokes such Fourth Amendment warrant requirements because we examine what is "unreasonable" in the light of the values of freedom of expression. *Id.* at 504, 93 S.Ct. at 2801.

*Roaden* is arguably not limited to seizures which infringe on First Amendment rights; the court's language and rationale is more sweeping. Warning that the fourth amendment should not be read in a vacuum, the court stated:

A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material. *Id.* at 501, 93 S.Ct. at 2800.

*Roaden* teaches that in determining the reasonableness of the SEC's possession and use of the Locke, Purnell report, this court should consider the value of the attorney-client privilege. This privilege is premised on the judicial belief that if clients are encouraged to make full disclosures to their attorneys, the attorneys will be better able to advise and represent them. Such relationships will facilitate the proper administration of justice. "While it relates to the rights of an individual, [the privilege] is nonetheless recognized, as so many of our fundamental rights are, as essentially in the public interest." *SEC v. Harrison*, 80 F.Supp. 226, 230 (D.D.C.1948). The privilege is deemed to be so important that neither the SEC, *see, e. g., McMann v. SEC*, 87 F.2d 377, 378 (2nd Cir.), *cert. denied*, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937); *SEC v. Harrison, supra*, nor the grand jury, *see, e. g., In Re Grand Jury Subpoenas Served Upon Field*, 408 F.Supp. 1169, 1172 (S.D.N.Y.1976), may intrude upon it.[8]

Because documents enjoying the attorney-client privilege have an intrinsic high expectation of privacy, arguably, a more rigorous fourth amendment standard ought to be applied to their seizures than to seizures of other materials. But we are not here deciding the reasonableness of the seizure; the question is the government's participation in the seizure. Here the height-

---

Prosser produce the document when it learned he possessed it, it was clear that when the FTC received the document, the agency knew that Prosser had stolen it. The court found that the FTC, "by its use of the documents knowingly gave its approval to Prosser's unlawful act," *id.* at 533, and thereby violated Knoll's fourth amendment rights. Recently the Seventh Circuit itself has limited *Knoll* significantly. *United States v. Marzano*, 537 F.2d 257, 271 (7th Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Billingsley*, 440 F.2d 823, 826 (7th Cir.), *cert. denied*, 403 U.S. 909, 91 S.Ct. 2219, 29 L.Ed.2d 687 (1971).

**8.** It is unquestionable, however, that the privilege does impede the search for truth. Consequently, the trend has been toward its strict application. *See, e. g., United States v. Friedman*, 445 F.2d 1076, 1087 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *Laughner v. United States*, 373 F.2d 326, 327 n.1 (5th Cir. 1967). Despite the drawbacks of protecting attorney-client communications, courts have long held that the benefits which spring from enforcing the privilege outweigh the harms and are essential to our system of justice.

ened expectation of privacy expected in a report of legal counsel is relevant in judging the facts sufficient to implicate the government in its seizure. Before attempting a statement of that standard, however, we must explore two fact questions. First, we must establish the degree of the SEC's participation in and knowledge of the informant's actions. Second, we must determine whether the Locke, Purnell report is actually privileged.

The SEC has submitted affidavits supporting its assertion that a former OKC employee contacted the defendants Mathis and Simms, provided them with the report, and gave them no reason to believe it had been stolen. The affidavits further state that neither Mathis nor Simms had any prior knowledge of the report's existence or participated in any way in the informant's acquisition of the report. The SEC concludes that since the government played no role in obtaining the report, it did not violate OKC's fourth amendment rights.

■ Defendant misconceives the nature of summary judgment. This court with the concurrence of the SEC and OKC halted all discovery. Thus far, OKC has not had the opportunity to engage in discovery on this issue such as interrogating SEC officials who have knowledge of how the agency received the report. Under Rule 56(f), Fed. R.Civ.P., plaintiff is entitled to discovery in order to file responsive affidavits. Until the ordered discovery is complete, this court will not consider the SEC's motion. As to the privileged nature of the report, the SEC argues that because the relevant facts are exclusively within OKC's knowledge and because OKC has failed to produce affidavits establishing its privileged status, the SEC is entitled to summary judgment. But privilege is not a determinant but a factor in the fourth amendment analysis and the court will withhold that determination pending discovery.

*Further Proceedings: Phase I*

■ The parties may proceed with discovery on the following matters: the extent of the SEC's knowledge of and involvement in the private party seizure of that document; the closely related question of the individual defendants' good faith; and, if necessary, the report's privileged status. The SEC is entitled to assert the informer's privilege.[9] In so ruling, this court has balanced the public interest in protecting the flow of information and assistance to the SEC against OKC's need for this discovery in the preparation of its case. *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Thus, in the course of discovery, OKC should not inquire into the identity of the informant(s) or seek to obtain his deposition. At the same time, because of the unique factual posture of the case, the informant(s) ought not go unexamined. The court has struck a balance between the strong competing interests and orders SEC counsel to examine the informant(s) in chambers with only court personnel, informant, and SEC counsel present. That testimony will be filed and sealed, and will be available only to the court. After all Phase I discovery has been completed, the court will examine all affidavits and depositions, including the sealed statements of the informant(s) to determine whether disclosure of the informant's identity is required. It will then before January 19, 1979, issue further orders either granting summary judgment or requiring certain additional discovery.

All Phase I discovery [and the *in camera* examination of the informant(s)] must be completed before December 31, 1978. The parties will cooperate to meet this deadline by agreeing to proceed with short notices and by agreement. The only present restraint now imposed upon the SEC is that it can make no use of the Locke, Purnell report pending completion of the ordered discovery. Should it develop that there is

---

9. The informer's privilege is well recognized, *Mitchell v. Roma,* 265 F.2d 633, 635 (3rd Cir. 1959); *see, Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1967), and is applicable to civil proceedings. *Westinghouse Electric Corp. v. Burlington,* 122 U.S.App.D.C. 65, 72–73, 351 F.2d 762, 769–70 (1965).

**554**

no fact question with regard to the SEC's contention as to how it obtained the report, this restraint will be lifted and discovery may proceed. The SEC investigation may then proceed with use of the report absent any further preliminary injunctive relief.

*Summary*

This court has granted defendant's motion to dismiss for lack of jurisdiction OKC's claim that in obtaining and using the report, the SEC is violating OKC's fifth amendment due process rights, but has found that it has jurisdiction over plaintiff's remaining claims.

The court has dismissed for failure to state a claim the following OKC claims:

1. That the SEC's investigation violates OKC's fifth amendment due process rights to the extent that OKC seeks monetary damages;

2. Its complaint under the Privacy Act;

3. Its FOIA complaint to the extent that it claims monetary damages from the individual defendants; and

4. Its complaint that the defendants violated § 14(e) of the Securities Exchange Act.

It has denied the SEC's motion to strike certain of OKC's pleadings. Finally, pending ordered discovery, the court has deferred ruling on the SEC's motions for dismissal or in the alternative for summary judgment on OKC's fourth amendment and remaining fifth amendment claims, and its FOIA claim to the extent that it seeks relief other than monetary damages from the individual defendants.