BOSTON HOUSING AUTHORITY & another[1] *vs.* BLANCA
GUIROLA.

Suffolk. April 1, 1991. - August 8, 1991.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ

*Controlled Substances. Landlord and Tenant,* Forfeiture of lease, Use of
premises. *Constitutional Law,* Double jeopardy, Search and seizure,
Probable cause, Use in civil proceeding of illegally obtained evidence.
*Search and Seizure,* Emergency, Probable cause.

In a proceeding asserting a landlord's right under G. L. c. 139, § 19, to
terminate the defendant's tenancy of a certain apartment after illegal
drugs were seized therein, the evidence warranted the judge's finding
that an occupant had used the apartment for unlawful purposes. [823-
824]

Dismissal of criminal charges against the tenant of a certain apartment,
arising from the seizure therein of weapons, ammunition, and illegal
drugs, did not bar on double jeopardy grounds a civil proceeding assert-
ing the landlord's right under G. L. c. 139, § 19, to terminate the ten-
ancy. [824-825]

Discussion of decisions of the Supreme Court of the United States con-
cerning the use in civil proceedings of illegally obtained evidence. [825-
827]

Certain evidence was properly seized in an apartment pursuant to a war-
rant issued on the basis of observations made by exterminators who had
entered the apartment lawfully, as well as the observations of a police
officer who lawfully entered the apartment to secure a weapon in plain
view; thus, even assuming the applicability of an exclusionary rule, the
evidence was properly admitted in a civil proceeding under G. L.
c. 139, § 19, to terminate the defendant's tenancy in the apartment.
[827-830]

CIVIL ACTION commenced in the City of Boston Division
of the Housing Court Department on March 13, 1989.

The case was heard by *E. George Daher,* C.J.

[1]Corcoran Management Co., Inc.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Howard P. Speicher* for the defendant.

*MaryLou Muirhead* for the plaintiffs.

*Rod Solomon*, for Boston Housing Authority, submitted a
memorandum.

*Valda Alden Winsloe & Richard M. Whitehill*, for Somer-
ville Housing Authority & others, amici curiae, submitted a
brief.

ABRAMS, J. Blanca Guirola, the defendant, appeals from a
judgment of the Housing Court terminating her tenancy in a
Boston Housing Authority apartment after illegal drugs were
discovered therein. See G. L. c. 139, § 19 (1990 ed.). She
claims that (1) G. L. c. 139, § 19, does not authorize the
termination of her tenancy where there is no evidence that
she or members of her family possessed the illegal drugs; (2)
the termination violates the double jeopardy clause of the
Fifth Amendment to the United States Constitution; and (3)
the evidence of drugs must be suppressed because it was ob-
tained in an illegal search and seizure. We transferred the
case to this court on our own motion. We affirm the Housing
Court's judgment.

The evidence as summarized by the judge was as follows.
Guirola is a resident of 816 Jette Court, which is part of
Commonwealth Development in the Brighton section of Bos-
ton. The property is owned by the Boston Housing Authority
(BHA) and managed by Corcoran Management Co., Inc.
(Corcoran), both plaintiffs herein. Guirola, her two children,
and her nephew are the only authorized tenants of the unit.

There was a dispute as to whether one William Taylor was
an unofficial occupant of the apartment. Guirola testified
that Taylor came to visit her every two or three weeks and
stayed with her for two or three days at a time. In 1988, she
went on a two-week trip to Europe with him. At the time of
the incident in question, he and some acquaintances had
been staying in the apartment for four days. A former neigh-
bor testified that she had seen Taylor come and go from

Guirola's apartment for the past two years and believed him to be Guirola's husband.[2]

Corcoran had scheduled extermination work in the units in Guirola's building for January 11, 1989. It sent notices to tenants to that effect in late December, 1988, and again on January 9, 1989. The notices to Guirola were slipped between her door and door jamb.

When the exterminators entered Guirola's apartment on January 11, 1989, they noticed a box of ammunition on the kitchen table, a barrel of a sawed-off shotgun poking over the broom closet, and a paper fold containing white powder in one of the bedrooms. They informed the site manager, who was outside. The site manager entered the apartment and saw the sawed-off shotgun and ammunition in the kitchen, as well as the notice of extermination on top of the refrigerator. He returned to his office and telephoned the housing authority police to inform them of the situation. He also attempted unsuccessfully to locate Guirola's work telephone number.

Officer William Smith of the housing authority police responded to the telephone call. He went to the apartment and spoke with the site manager and one of the exterminators. He then entered the apartment and observed the ammunition, the sawed-off shotgun, and the powder. Based on his experience and training, he believed the powder to be cocaine. He then secured the unit, and removed the sawed-off shotgun to ensure that no one would return and use it. He then went to obtain a search warrant at Brighton Division of the District Court Department. The warrant was issued and Smith conducted a search. The search revealed a sawed-off shotgun, a .22 caliber pistol, a triple beam balance scale, a smaller scale, drug paraphernalia, two telephone "beepers," a

---

[2]The neighbor testified that she saw Taylor leave the apartment at 7:30 or 7:45 A.M. and return at 5 or 5:30 P.M. five days a week. She assumed that he was going to work. In a subsequent proceeding on the issue of a stay of the eviction, the judge stated, "William Taylor was not some idle stranger to [Guirola]. The relationship was so close that Mr. Taylor could have been perceived as to be living in the apartment for two years, and as being the husband of Ms. Guirola."

bag of 6.18 grams of cocaine, and three bags of marihuana. The bag of cocaine was found in the pocket of a child's jacket.

The BHA and Corcoran filed a complaint in the City of Boston Division of the Housing Court Department seeking a temporary restraining order and permanent injunction terminating Guirola's right to occupy the apartment. After trial, the judge granted the relief requested. Guirola moved for a stay of judgment, which was denied. On October 27, 1989, a single justice of the Appeals Court allowed the motion for a stay pending appeal conditioned on the requirements that there be no illegal drugs, contraband, or otherwise illegal activity on the premises, and that no persons known or reasonably suspected to be involved in illegal activity, particularly William Taylor, be allowed therein.[3]

1. *The applicability of the statute.* General Laws c. 139, § 19 (1990 ed.), authorizes a landlord to void a lease if a "*tenant or occupant* . . . uses such premises . . . for . . . the illegal keeping, sale or manufacture of controlled substances" (emphasis added).[4] Guirola argues that the statute applies

---

[3]At approximately the same time, the Commonwealth instituted criminal proceedings against Guirola and Taylor for illegal possession of weapons, illegal possession of ammunition, possession of Class B drugs with intent to distribute, and possession of Class D drugs with intent to distribute. In February, 1990, a judge of the Superior Court granted motions by both Guirola and Taylor to suppress all evidence seized from the apartment. He found that Smith's initial entry into the apartment before obtaining the warrant was not justified by any exception to the warrant requirement of the Fourth and Fourteenth Amendments to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights. He therefore held that the subsequent search pursuant to the warrant also was illegal. The Commonwealth did not appeal, see Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979), and the criminal cases were dismissed.

[4]General Laws c. 139, § 19, provides: "If a tenant or occupant of a building or tenement, under a lawful title, uses such premises or any part thereof for the purposes of . . . the illegal keeping, sale or manufacture of controlled substances, as defined in section one of chapter ninety-four C, such use shall at the election of the lessor or owner annul and make void the lease or other title under which such tenant or occupant holds and, without any act of the lessor or owner, shall cause the right of possession to revert and vest in him, and he may, without process of law, make imme-

only to conduct by the tenant herself. She argues that the evidence suggested at most that Taylor possessed the drugs, and that there was no evidence that she or her family knew of or were in any way involved with their presence. She therefore claims that her lease cannot be voided by operation of the statute.

Guirola's argument is defeated by the words of the statute themselves. By its terms, G. L. c. 139, § 19, applies to conduct by a "tenant or occupant." Guirola does not contend, nor could she, that there was insufficient evidence that Taylor was an occupant. In the proceedings on the stay, the judge credited the neighbors' testimony that Taylor was so frequently at the apartment as to be perceived as living there as Guirola's husband. See note 2, *supra.* The judge properly could determine that an occupant of the unit used the apartment for unlawful purposes. There was no error.

2. *Double jeopardy.* Relying on *United States* v. *Halper,* 490 U.S. 435 (1989), and *Kvitka* v. *Board of Registration in Medicine,* 407 Mass. 140, cert. denied, 111 S. Ct. 74 (1990), Guirola argues that the double jeopardy clause of the Fifth Amendment to the United States Constitution[5] precludes the BHA from terminating her tenancy after the criminal complaint against her had been dismissed.[6] See note 3, *supra.* Her argument misconstrues the import of these cases.

Both *Halper* and *Kvitka* involved proceedings to impose civil penalties after criminal convictions had been obtained and punishment imposed. In *Halper,* the Supreme Court reiterated the basic premise that "the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments

---

diate entry upon the premises, or may avail himself of the remedy provided in chapter two hundred and thirty-nine."

[5]The double jeopardy clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb."

[6]Although we address Guirola's arguments on the merits, we note that the Housing Court's judgment in this case was entered prior to the Superior Court judge's order allowing Guirola's motion to suppress.

for the same offense." *Halper, supra* at 440. Guirola was neither convicted nor acquitted of any criminal offense related to the drugs found in the apartment. Certainly she never has been penalized for the incident. The dismissal of the complaint after the judge granted the motion to suppress presumably was based on a resultant lack of evidence with which to prosecute. It did not purport to resolve the question of her guilt or innocence. The double jeopardy clause simply does not apply in these circumstances.

3. *Suppression of the evidence.* Guirola's final argument is more substantial. She contends that, as the Superior Court judge held in the criminal case, the evidence of drugs in the apartment was obtained illegally. Therefore, she argues that that evidence cannot be used against her in this c. 139, § 19, proceeding. The plaintiffs, on the other hand, strongly object to the application of the exclusionary rule in a civil proceeding. In this proceeding, Guirola relies solely on the Fourth Amendment to the United States Constitution as applied to the States through the Fourteenth Amendment.[7]

The United States Supreme Court has not decided whether the exclusionary rule applies to civil proceedings of the precise nature authorized by G. L. c. 139, § 19. One analogous situation on which it has spoken is civil forfeiture proceedings. In *One 1958 Plymouth Sedan* v. *Pennsylvania,* 380 U.S. 693 (1965), the Court held that, because a proceeding for the forfeiture of an automobile used in the commission of an illegal act was a "quasi-criminal" proceeding, resulting in the imposition of a penalty, the exclusionary rule bars the admission of evidence seized in violation of the Fourth Amendment. Although the text of G. L. c. 139, § 19, suggests that its purpose is not punitive but curative — the

---

[7]Guirola does not make any argument under art. 14 that the search was illegal or that under art. 14 the exclusionary rule applies to court proceedings under G. L. c. 139, § 19. We therefore leave open the question whether a State constitutional or statutory exclusionary rule applies to all or some c. 139, § 19, proceedings. See *Commonwealth* v. *Upton,* 394 Mass. 363, 364-369 (1985); *Selectmen of Framingham* v. *Municipal Court of the City of Boston,* 373 Mass. 783 (1977).

removal of a nuisance — the statute's impact on the ousted tenant is similar to that of the forfeiture proceeding in *One 1958 Plymouth Sedan, supra.* See 1 W. LaFave, Search and Seizure § 1.7(a), at 148 (2d ed. 1987) ("there does not appear to be any doubt but that the *Plymouth Sedan* approach is called for when the government instead brings an action to abate a nuisance and would prove the illegal activity constituting the nuisance by the means of evidence come by through an unconstitutional search"). We note that other Federal courts have applied the exclusionary rule in civil proceedings in a wide range of business-related and property contexts. See, e.g., *Savina Home Indus.* v. *Secretary of Labor*, 594 F.2d 1358 (10th Cir. 1979) (Occupational Safety and Health Review Commission proceedings); *Knoll Assocs., Inc.* v. *FTC*, 397 F.2d 530 (7th Cir. 1968) (Federal Trade Commission proceedings on discriminatory pricing practices); *OKC Corp.* v. *Williams*, 461 F. Supp. 540 (N.D. Tex. 1978) (Securities and Exchange Commission proceedings).

More recently, the Supreme Court seems to be moving away from relying on the nature of the proceeding to determine whether the exclusionary rule applies and instead balances the deterrent benefits to be obtained from its application against the societal costs. See *Immigration & Naturalization Serv.* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) (deterrent value in applying exclusionary rule in civil deportation proceedings outweighed by societal costs); *United States* v. *Janis*, 428 U.S. 433 (1976) (State police unlikely to be deterred by application of exclusionary rule to Federal tax proceedings); *United States* v. *Calandra*, 414 U.S. 338 (1974) (minimal deterrence in applying exclusionary rule to grand jury proceedings where police already are deterred by its application at trial).[8] It is unnecessary for us to determine whether the United States Supreme Court would now hold, as a matter of Federal law, that the additional deterrent ben-

---

[8] It may be that the force of the deterrence rationale is heightened where the BHA uses self-help to void the lease or where the entry into an apartment is accomplished by a violation of a tenant's rights far more egregious than occurred here.

efit to be obtained from applying the exclusionary rule to c. 139, § 19, proceedings as well as corollary criminal proceedings outweighs the societal costs so that the evidence would be inadmissible in this type of proceeding. Even if the exclusionary rule were to be applied, the evidence was not obtained in violation of the Fourth Amendment.

Three separate entries into the apartment are at issue: the exterminators' initial entry, BHA Officer Smith's prewarrant verification entry, and the full search pursuant to the warrant.[9] Although Guirola does not concede that the entry of the exterminators into her unit was lawful, it clearly presents no constitutional problems. The lease permitted the management to enter the premises for extermination purposes on forty-eight hours' notice. Management provided two written notices before the forty-eight-hour deadline to inform Guirola of the scheduled extermination, and one of those notices was found on top of her refrigerator. The exterminators' entry clearly was authorized by consent and therefore was not unlawful.

---

[9]Guirola does not argue that principles of issue preclusion bar a determination in this case of the legality of the search and seizure after the judge in the criminal case held that they were unlawful. Although due process may require the application of issue preclusion to bar the relitigation of a suppression order in a subsequent criminal proceeding between the same parties, there is no requirement where the subsequent proceeding is civil. See *United States ex rel. DiGiangiemo* v. *Regan*, 528 F.2d 1262, 1266 (2d Cir. 1975), cert. denied sub nom. *DiGiangiemo* v. *Olgiatti*, 426 U.S. 950 (1976); *United States* v. *Evans*, 655 F. Supp. 243, 245-246 (E.D. La. 1987). Nor is issue preclusion a jurisdictional bar. See *Matter of Mayberry*, 295 Mass. 155, 161 (1936). Moreover, a resolution of Guirola's right to assert issue preclusion against the BHA would depend on factual issues not considered below, such as whether the Commonwealth was a "virtual representative" of the BHA in the suppression hearing. See *United States* v. *Bonilla Romero*, 836 F.2d 39, 43 (1st Cir. 1987), cert. denied, 488 U.S. 817 (1988); *Aerojet-General Corp.* v. *Askew*, 511 F.2d 710, 719 (5th Cir.), cert. denied sub nom. *Metropolitan Dade County* v. *Aerojet-Gen. Corp.*, 423 U.S. 908 (1975). Guirola's development of the argument on the merits that the search was in fact illegal indicates her acquiescence in our consideration of the issue. Her failure to raise and brief the issue preclusion argument on appeal is deemed a waiver of any objection. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

Smith's entry also was lawful pursuant to the lease. The lease allowed management entry without notice for emergency purposes.[10] The exterminators' observations of a sawed-off shotgun, ammunition, and "a paperfold containing white powder" presented a sufficient emergency to permit, under the lease, the BHA police officer's initial entry to the apartment for safety purposes. We previously have noted the threat to the safety and security of public housing tenants posed by other residents' illegal conduct. See *Spence* v. *Reeder*, 382 Mass. 398, 402-403 (1981).[11] When managers of a multi-unit housing project legally learn of the presence of a lethal weapon in one of the units, a resultant concern for the safety of the other tenants is entirely reasonable. Therefore, Smith was justified in treating the exterminators' report of their observations as an "emergency" under the lease. Moreover, the scope of his entry was no broader than justified given the nature of the emergency presented. He merely verified the plain view observations already lawfully noted by the exterminators, and removed the sawed-off shotgun because, in his words, "I was in fear that if anybody did get into the apartment, there was ammunition right there. They would have a weapon when we went back into the apartment . . . ."[12]

---

[10]The lease also provided that in case of an emergency entry management must make a reasonable effort to contact the tenant. There is no evidence to support a finding that management did not comply with these procedures. The judge found that the site manager attempted to locate Guirola's telephone number at work. The site manager testified that within the past year management had requested Guirola's work telephone number.

[11]In 1980, there was an "almost total absence of safety and security in BHA's developments." *Spence* v. *Reeder*, 382 Mass. 398, 402 (1981).

[12]It is not clear whether, as an alternative to entering and removing the sawed-off shotgun, Smith could have secured the premises and prevented any of the occupants from entering during the time it took him to obtain the warrant. The Supreme Court has not addressed this issue. See *Segura* v. *United States*, 468 U.S. 796, 809 (1984) (opinion of Burger, C.J.). The United States Court of Appeals for the First Circuit has held that entry to secure a residence from within is unconstitutional. See *United States* v. *Curry*, 751 F.2d 442, 448 (1st Cir. 1984). It also is not clear whether, in the absence of an arrest, the officer could prevent Guirola or her children

Furthermore, even absent the consent provided in the lease, we think that this search is lawful under the Fourth Amendment to the United States Constitution. See note 7, *supra*. The sawed-off shotgun and drugs were left in the apartment in plain view the day on which exterminators were scheduled to be there. Guirola's reasonable expectation of privacy in these items was therefore substantially diminished. See *Horton* v. *California*, 496 U.S. 128, 133-134 (1990); *Coolidge* v. *New Hampshire*, 403 U.S. 443, 465-471 (1971). Moreover, Officer Smith did not conduct a full-blown, warrantless search of the apartment. His walk-through was cursory, limited in scope, and primarily designed to remove the potential for danger to the community and to the police posed by the sawed-off shotgun.[13] In these circumstances, we think the search would be held reasonable under the Fourth Amendment. See *United States* v. *McKinney*, 477 F.2d 1184 (D.C. Cir. 1973) (after hotel employee observed sawed-off shotgun in plain view, warrantless entry into room by the police and removal of live shell from gun was valid; loaded gun posed a danger to the community).

Finally, even if Smith's entry was unlawful, the evidence still would be admissible because the exterminators' observations provided an independent source of probable cause to obtain the search warrant. See *Segura* v. *United States*, 468 U.S. 796, 813-816 (1984) (legality of initial entry of police into apartment is irrelevant to applicability of exclusionary rule where later search and seizure was pursuant to valid warrant based on information obtained from an independent source. "The valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry. *Wong Sun* [v. *United States*, 371 U.S. 471, 488 (1963)]"). The full search was not conducted until after the warrant was issued.

(one of whom was in high school) or her nephew from entering the apartment.

[13]Guirola does not make any argument that she had a right to possess a sawed-off shotgun in her home under the Second Amendment to the United States Constitution.

The third entry, the search and seizure by the officers pursuant to the warrant, also was lawful because Smith's and the exterminators' observations provided adequate probable cause to obtain the warrant. Guirola contends that the observation of a white powder cannot constitute probable cause to believe that the powder is an illegal controlled substance without laboratory analysis. The Federal courts, however, have made clear that an officer properly may rely, as did Smith, on his training and experience to determine without laboratory testing that a substance is an illegal drug. See *Johnson* v. *United States*, 333 U.S. 10, 13-14 (1948) (officers may rely on their experience to identify an odor as burning opium establishing probable cause to issue a search warrant); *United States* v. *Rosario*, 638 F.2d 460, 462 (2d Cir. 1980) (officer's identification, based on his experience, of a white powdery substance as cocaine, establishes probable cause to arrest). The exterminators' description of white powder in a paperfold seen in an apartment that contained a sawed-off shotgun and ammunition, as well as Smith's testimony that he believed the powder to be cocaine based on his experience and training, supplied sufficient probable cause to believe that contraband was present.

The evidence seized from Guirola's apartment was properly admitted in evidence under the Fourth Amendment even if the exclusionary rule requires suppression of unlawfully obtained evidence in c. 139, § 19, proceedings.

*Judgment affirmed.*